Thomas L. J. Corcoran, J.
In this action for a declaratory-judgment and for a permanent injunction against the Commissioners of Police and of Licenses of the City of New York, the plaintiffs now move for an injunction pendente lite.
The plaintiff Sunshine Book Company is a nonprofit corporation organized under the laws of the State of New Jersey. It publishes a monthly periodical called “ Sunshine and Health ”, which is the official publication of the American Sunbathing Association, Inc., (not a party to this action). The plaintiff Solar Union Naturismo, Inc., is also a New Jersey nonprofit corporation. It publishes a bimonthly periodical, “ Solaire Universelle de Nudisme ”, also known as “ SUN Magazine ”. The plaintiff Ilsley Boone is the managing editor of “ Sunshine and Health ” and the editor of “SUN Magazine ”. The plaintiff G. I. Distributors, Inc., a New York corporation, is in the business of distributing numerous periodicals, including those mentioned, to newsdealers in New York City.
In November, 1951 a number of persons, who operate stationery stores or newsstands in the city of New York, were arrested by police officers for selling or having for sale the magazines, “ Sunshine <& Health ” and “SUN Magazine ”. They were charged with violating section 1141 of the Penal Law which, among other things, prohibits the sale or distribution, or the possession for sale or distribution, of “ any obscene, lewd, lascivious, filthy, indecent or disgusting book, magazine, pamphlet, newspaper * * * photograph [etc.] ”.
The plaintiffs state the names and addresses of four of the newsdealers who were arrested. None of them is a party to this action, but the plaintiffs allege that the arrests of these newsdealers for selling the magazines which the plaintiffs publish or distribute has resulted in a refusal by newsdealers to handle these magazines. The Police Commissioner makes no issue of the fact that the arrests of the newsdealers will deter them and other newsdealers from offering these magazines for sale to the general public, and I assume that the arrests will have such an effect.
In that same month, November, 1951 the Commissioner of Licenses of the City of New York sent to newsdealers licensed under the jurisdiction of his department the following notice:
*329 SUNSHINE BOOK CO. v. McCAFFREY [8 Mise 2d 327]
‘ ‘ Department of Licenses
City of New York
To All Newsdealers Licensed under the Jurisdiction of the Department of Licenses:
You are cautioned to discontinue the sale and to remove from display the following magazines or periodicals:
Sunshine and Health
Sunbathing for Health Magazine
Modern Sunbathing and Hygiene
Hollywood G-irls of the Month
Hollywood Models of the Month
In the event you display or offer for sale any of the above identified publications on or after November 27, 1951 steps will be taken looking to the suspension or revocation of your license.
Edward T. McCaffrey
November 19,1951 Commissioner ”
The publication “SUN Magazine” was inadvertently omitted from the list contained in the notice, but the plaintiffs and defendants agree that it should be deemed included. In any event, there is such a similarity between the magazine “ Sunshine and Health ”, which is on the list, and u SUN Magazine ” that the law applicable to one would be applicable to the other.
According to the plaintiffs, the issuance of the notice by the commissioner of licenses had the same effect of deterring sale and distribution of the magazines as did the arrests which were directed by the commissioner of police. The commissioner of licenses does not dispute this. It is, in fact, the very effect which his notice was intended to produce.
The complaint alleges that there was a conspiracy by both the commissioner of police and the commissioner of licenses to deprive the plaintiffs of their legal rights. The allegations of conspiracy are extremely broad, and there are no facts stated in the plaintiffs’ affidavits to support these allegations. Each commissioner in his answering affidavit states that he acted independently of the other and flatly denies the existence of any conspiracy. On this motion, consideration will be given only to those phases of it which are directed to each commissioner separately because I do not find that there was any conspiracy.
The plaintiffs ask that the police commissioner be enjoined from prosecuting pending criminal proceedings against the newsdealers arrested and from instituting any new proceedings based on the sale or offer for sale of the periodicals, and that the *330 commissioner of licenses be enjoined from threatening newsdealers under his jurisdiction with suspension or revocation of licenses if they sell or offer for sale the periodicals which the plaintiffs publish or distribute.
Copies of the November, 1951, and December 1951, issues of “ Sunshine and Health ” and of the November-December, 1951, and J anuary-February, 1952, issues of “ SUN Magazine ” have been submitted by the plaintiffs with their assurance that they are typical of other issues of the magazines. Both periodicals are devoted exclusively to the theories and practices of nudism, “ Sunshine and Health” being generally limited to the United States and Canada, and “SUN Magazine ” being international in scope. The four issues contain reports of meeting and conventions, reports of officers, the “ Olympic Games ” of the movement, public relations theories for the expansion of nudism, reports of regional associations and local clubs, conflicts between nudism and the law, expositions of nudism for the advancement of physical and mental health, religious justifications-of nudism, etc. There is nothing obscene in the literary content, and the defendants state in their brief: “ Neither are we directly concerned with the ‘ nudist ’ question as such, nor with the publications of magazines or literature which advocate the practice of ‘ nudism
In each of the issues there is a repletion of photographs of naked persons. These photographs have caused the present controversy. They generally fall into two categories. Some of them are action pictures showing nudists in their camp activities, rowing, hitting volley balls, building fires, etc. In others, the editors are more subtle in their glorification of nudism. They show shapely and attractive young women in alluring poses in the nude. It is significant that the photographs of the second category are the ones selected for the covers of all issues without exception. These photographs are front views. They are cleverly colored to picture clearly the female breasts and pubic hair. They take up nearly all the space on the covers, leaving only enough for the title, price and issue identification.
That phase of the motion which seeks a temporary injunction against the commissioner of police is denied. The commissioner will not be restrained from prosecuting the pending cases or from making arrests in the future. As was stated in Mills Novelty Co. v. Sunderman (266 N. Y. 32,36): “ A court of equity, even where property interests are incidentally affected, will not ordinarily interfere with criminal processes, unless there would be irreparable injury and the sole question involved is one of law. (Delaney v. Flood, 183 N. Y. 323.) ” Obviously, only when *331 the question of law is determined in favor of the applicant for relief will there he interference, assuming the presence of all other elements. Truax v. Raich (239 U. S. 33), the case principally relied on by the plaintiffs, is in harmony with the rule of our State courts. In that case, the Supreme Court affirmed an interlocutory judgment of injunction granted by a court of equity against the prosecution of criminal proceedings. The statute there involved was unconstitutional and, under the facts of that case, unless enforcement of the statute was restrained, the complainants had no adequate remedy.
The case at bar does not fall within the rule of Truax v. Raich and, entirely apart from the question of equitable jurisdiction, I would not interfere with the acts of the police commissioner. Subdivision 1 of section 1141 of the Penal Law, under which the police commissioner acted, is valid and constitutional. The commissioner was properly performing his duty in causing the arrest of those who violate its provisions.
The plaintiffs devote much of their brief to the argument that concepts of obscenity and indecency are variable. They contend that they are of such a shifting nature that there is no ascertainable standard of guilt under subdivision 1 of section 1141, and that the statute is therefore unconstitutional and unenforcible.
Simply because ideas of what is obscene vary from time to time and from place to place, does not leave us without a moral understanding in our own time and in our own community. It is true that the words obscene, lewd, lascivious and indecent, appearing in subdivision 1 of section 1141 of the Penal Law, are not technical legal terms, such as are the words homicide, rape and larceny. Indeed, it is difficult to give them any precise or comprehensive legal definition. But it does not follow that the statutory prohibition is therefore indefinite or variable. Indecency and obscenity have been offenses against the public order for generations. (See Harris & Wilshire on Criminal Law [16th ed.], pp. 169, 171; 1 Bishop’s Criminal Law [9th ed.], §§ 500, 504), and statutes similar to section 1141, subdivision 1, have been adopted in many other States. The interpretation of what is prohibited may differ in details with changes of circumstances, but the pattern of protecting the people from public indecency remains the same.
The statute prohibits obscenity and indecency as we understand those terms in this State today. It is true that in determining what is obscene, “ The law will not hold the crowd to the morality of saints and seers.” (Cardozo on Paradoxes of Legal Science, p. 37.) But neither will it accept the judgment of sensualists and libertines. Nor is a criterion of proper conduct to be *332 established by the antics of faddists. The test of decency is the fair judgment of reasonable adults in the community. The validity of such a test is well recognized in our jurisprudence, and the fact that there are variations depending upon the mores of the community does not destroy it.
. Two jurists who have served as Chief Judges' of our Court of Appeals have expressed this view. The late Judge Cardoso stated it in his Paradoxes of Legal Science (pp. 36, 37): “It comes down to this. There are certain forms of conduct which at any given place or epoch are commonly accepted under the combined influence of reason, practice and tradition, as moral or immoral. If we were asked to define the precise quality that leads them to be so characterized, we might find it troublesome to make answer, yet the same difficulty is found in defining other abstract qualities, even those the most familiar. The forms of conduct thus discriminated are not the same at all times or in all places. Law accepts as the pattern of its justice the morality of the community whose conduct it assumes to regulate.”
The present Chief Judge of our Court of Appeals, Judge Loughran, expressed the same view in People v. Winters (294 N. Y. 545, 551): “In the nature of things there can be no more precise test of written indecency or obscenity than the continuing and changeable experience of the community as to what types of books are likely to bring about the corruption of public morals or other analogous injury to the public order. Consequently, a question as to whether a particular publication is indecent or obscene in that sense is a question of the times which must be determined as matter of fact, unless the appearances are thought to be necessarily harmless from the standpoint of public order or morality. ’ ’
Although the United States Supreme Court, in Winters v. New York (333 U. S. 507), reversed the decision of the Court of Appeals in People v. Winters {supra) it had before it an entirely different statutory provision than the one involved in this case. At that time, section 1141 of the Penal Law consisted of two subdivisions. Subdivision 1 was basically the same as it now is. It was subdivision 2 that was struck down and the Supreme Court, after holding the second subdivision invalid for indefiniteness, cited subdivision 1 as an illustration of a statute which met the test of definiteness.
The plaintiffs rely heavily upon Parmelee v. United States (113 F. 2d 729). That case held that books entitled “ Nudism in Modern Life ”, which contained pictures of nude men and women, were not obscene. The court found that only a few photographs were questionable and that they did not furnish the domi *333 nant note of the publications. These photographs, incidentally, were unretouched and uncolored. There is no denying the fact, however, that the majority opinion in the Parmelee case appears to support the plaintiffs’ views. Insofar as it does, it is rejected as unsound. There are numerous references in that opinion to the writings of sociologists and psychologists' upon whose opinions the plaintiffs also rely. At page 737, the opinion states: “ there are many unexplored areas of social science. If anything, there is needed today greater patience and greater tolerance concerning research in sociology than in medicine; looking to the day when social scientists can advise not only courts, but the people generally ”. Perhaps that day will sometime arrive. Until it does, the courts will do well to administer justice in accordance with the rules of positive morality, approved by the reasonable public opinion of the community.
The opinions of the anthropologist, sociologists and psychologists upon which the plaintiffs rely are not persuasive. The different customs and moral standards of ancient peoples, of African natives, of Australian aborigines, and of desert tribes, and the various concepts of these peoples as to what is chaste and demure, and as to what is immodest and lewd, afford us little assistance in determining what is obscene and indecent in the State of New York in the year 1952. Extreme and weird examples of deviations from our accepted standards can be found among the many races of mankind. Bizarre notions can also be found among civilized nations in man’s long history. Such examples do not justify repetition in our society. It is interesting to note, nonetheless, that the authors upon whom the plaintiffs rely so heavily fail to give examples of any civilized nations that accepted the practice of nudism as a general custom. It would appear that even they must concede that the use of clothing to cover one’s sexual organs has been, throughout history, the practice of all humans except for the lowest grades of savages.
Of course, nudity is not necessarily obscene. There are situations where no valid objection can be made to it. In the arts, in medicine, and in other sciences, we have ready examples. The fact that nudity in such instances may have the incidental effect of arousing sexual desires is not always sufficient reason for barring it. As to the conditions and circumstances under which nudity is permissible, reason sets the proper limits.
Where the dominant purpose of nudity is to promote lust, it is obscene and indecent. The distribution and sale of the magazines in this case is a most objectionable example. The dominant-purpose of the photographs in these magazines is to attract the attention of the public by an appeal to their sexual impulses. *334 The sale of these magazines is not limited to any mailing list of members or subscribers. They are sold and distributed indiscriminately to all who wish to purchase the same. Men, women, youths of both sexes, and even children, can purchase these magazines. They will have a libidinous effect upon most ordinary, normal, healthy individuals. Their effect upon the abnormal individual may be more disastrous. Their sale and distribution is bound to add to the already burdensome problem of juvenile delinquency and sex crimes, and the commissioner of police properly arrested those who participated in this violation of our Penal Law.
With respect to that branch of the motion which seeks to restrain the commissioner of licenses, the plaintiffs contend that, even assuming the magazines in question do violate provisions of the Penal Law, the commissioner had no right to send out the notice which he did. They argue that he is without jurisdiction to revoke newsdealers ’ licenses because of the nature of the publications which they sell or exhibit for sale. They also claim that the effect of his notice was to impose a prior restraint ■upon publication in violation of the State and Federal Constitutions.
The commissioner of licenses has licensing power over certain newsdealers. (Greater New York City Charter, § 773; L. 1901, ch. 466; Administrative Code of City of New York, §§ B32-58.0 to B32-74.1.) In common with the heads of all departments of the city he may make rules and regulations for the conduct of his office or department and to carry out its functions and duties. (Greater New York City Charter, § 885, subd. a.) Although his powers to make rules and regulations are unquestionably limited so that the commissioner may not, by rule making, accomplish the adoption of laws not already on the statute books, his powers would appear to include the adoption of rules and regulations to prevent newsdealers who are licensed by his department from using those licenses to engage in activities in open and notorious violation of our Penal Laws.
It has been held, for example, that reasonable regulations may be adopted by the commissioner to aid him in performing duties assigned to him by statute. (Acorn Employment Service v. Moss, 261 App. Div. 178.) Reasonable rules barring the sale of “ racing tip ” sheets or “ policy ” slips Avould also appear to be Avithin the commissioner’s poAvers. (Cf. Armstrong Racing Pubs. v. Moss, 181 Misc. 966.) I agree with the observation made in that case (p. 968) that the commissioner, “ in his official capacity, has, despite the ministerial character of his duties, certain super- *335 vipory and regulatory powers In bn exercised, particularly to .safeguard public morals.”
The action of the license commissioner does not constitute a prior restraint upon publication within the prohibition of the State and Federal Constitutions.
The guarantee of freedom of speech and of the press contained in section 8 of article I of the New York State Constitution and in the First and Fourteenth Amendments of the United States Constitution prevents prior restraints upon publication. The fact that a person abuses this liberty by publishing defamatory, scurrilous or other improper matter ordinarily does not justify the State or any of its agencies from restraining such person or such publication in the future.
There are recognized limitations to this principle, however. Justice Story in discussing the First Amendment of the Federal Constitution says (Story on the Constitution, Yol. 2 [5th ed.], § 1880): ‘1 That this amendment was intended to secure to every citizen an absolute right to speak, or write, or print whatever he might please, without any responsibility, public or private, therefor, is a supposition too wild to be indulged by any rational man * * * the language of this amendment imports no more than that every man shall have a right to speak, write, and print his opinions upon any subject whatsoever, without any prior restraint, so always that he does not injure any other person in his rights, person, property, or reputation; and so always that he does not disturb the public peace.”
Near v. Minnesota (283 U. S. 697) whose quotations are generously interspersed in the plaintiffs’ brief, reiterates the constitutional doctrine that there can be no previous restraint upon publications. But the Supreme Court did not go as far as the plaintiffs contend. It did not hold that, even if obscene periodicals are openly and continuously sold in a community, the public is helpless to prevent recurrences by anticipatory action. Actually, both the majority and minority opinions indicated that, in such a situation, a community could protect itself by previous restraint. The Minnesota statute before the court provided that a person who possessed or sold 11 (a) an obscene, lewd and lascivious newspaper, magazine, or other periodical, or (b) a malicious, scandalous and defamatory newspaper, magazine or other periodical ” (Minn. Stats. 1927, § 10123-1) was guilty of a nuisance which could be enjoined. The question before the court involved clause (b) relative to scandalous and defamatory newspapers, and the court held that there could be no previous restraint under that subdivision. The court made it clear, however, that restraint under clause (a) relating to obscene, lewd *336 and lascivious publications would be proper. It said at pages 715-716: “ The objection has also been made that the principle as to immunity from previous restraint is stated "too broadly, if every such restraint is deemed to be prohibited. That is undoubtedly true; the protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases ”.
The court then stated that one of these exceptions was that" “ the primary requirements of decency may be enforced against obscene publications.”
The notice released by the Commissioner of Licenses does not constitute a prior restraint within the constitutional prohibition. In exploring the question of previous restraint, we should examine the essence of that notice. While it mentions the plaintiffs’- periodicals by name, it is clear that it was not meant to apply to such periodicals if they did not contain pictures of nudes. Attached to the moving papers are clippings from New York newspapers concerning the commissioner’s notice when he released it to the press. The newspaper reports indicate very clearly that the notice, although mentioning a list of magazines by name, was actually directed against publications which contain photographs of nudes, such as those now before "the court. The plaintiffs’ submission of these newsclippings and the agreement of the parties that “ SUN Magazine ” should be included in the commissioner’s notice, even though it was not mentioned by name, shows that the parties so understood the notice. It was directed against the sale by newsdealers under the jurisdiction of the license department, not of nudist magazines or literature, as such, but only against those which contain pictures of naked persons.
Perhaps the commissioner should amend the notice to the newsdealers so that it will be made clear to them that the magazines referred to are objectionable when they contain pictures of nudes. It may be that the plaintiffs would eliminate the pictures in future issues. If they intend to do so, they may apply for relief. The temporary injunction will not now be granted, however, since it is clear from the papers submitted on the motion that the plaintiffs understood the notice to be directed against sale of the magazines as they presently appear. The temporary injunction is sought against any such notice by the commissioner, even though limited in the way I have indicated.
The motion is in all respects denied.