MONFRED ᴇᴛ ᴀʟ. *v.* STATE

[No. 55, September Term, 1961 (Adv.).]

314

*Decided August 9, 1961.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ.

*Martin B. Greenfeld,* with whom were *William Greenfeld* and *Albert B. Polovoy* on the brief, for the appellants.

*Clayton A. Dietrich, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, Saul A. Harris, State's Attorney for Baltimore City,* and *James W. Murphy, Assistant State's Attorney,* on the brief, for the appellee.

HORNEY, J., delivered the opinion of the Court.

The appellants, who engage in the retail sale of books and magazines in Baltimore City, were convicted by the Criminal Court of Baltimore of violating Code (1960 Cum. Supp.), Art. 27, § 418 (a), which makes it a misdemeanor for any person to "knowingly * * * sell * * * any lewd, obscene, or indecent book, magazine * * * drawing or photograph." The subject matter of the prosecutions was six magazines,[1] commonly known or described as "girlie" magazines, and a set of semi-nude photographs portraying a sequential "striptease."[2]

The magazines and photographs were openly displayed and offered for sale without overcharge along with other types of magazines on newsstands or in the establishments of the several appellants. The magazines which are the subject of this appeal were purchased by members of the Baltimore City Police Department, who were specifically instructed to make purchases of named or similar magazines. The set of photographs was purchased by a member of the Criminal Justice Commission. The record shows that publications of a similar type had been on display and sold in the city for at least five years prior to the arrest of the appellants.

---

1. The publication entitled *Candid* was introduced as evidence against Harry Monfred; *Consort* against James Spissler; *Sextet* against Samuel Mendelson and Albert King; *Cloud 9* against Mendelson; *Torrid* against Sander A. Siegel and Benjamin M. Siegel; and *Black Garter* against Monfred, King and both Siegels.

2. The set of fifteen photographs was introduced against the defendant King.

The trial court—applying the obscenity test set forth in *Roth v. United States* (and *Alberts v. California*), 354 U. S. 476 (1957)—concluded that the magazines and photographs were "neither literary in nature, artful in presentation, nor innocent in purpose" and that the dominant theme of the magazines and photographs dealt "with sex in a manner appealing to prurient interest" in that they had a "tendency to excite lustful thoughts," and found that such materials were "lewd, obscene and indecent" and therefore violated the obscenity statute of this State. All the defendants were found guilty and all were sentenced to pay fines.

The appellants claim (i) that the magazines and photographs are not obscene within the meaning of the statute because such materials do not "as a matter of law" exceed contemporary community standards; and (ii) that if such materials are obscene under the statute, then the statute violated the First and Fourteenth Amendments to the Constitution of the United States. But the real contention is—inasmuch as it is claimed that the suspect material is not "hard-core pornography"—that the appellants were immune from prosecution under the statute.

Since these cases were tried by the court sitting without a jury, we have the right to review them on both the law and evidence to determine whether in law the evidence was sufficient to sustain the conviction in each case, though we may not set the verdict aside on the evidence unless it is clearly erroneous. Maryland Rule 741 c.

In cases such as these, where prosecution is based primarily on the exhibits introduced as evidence, oral evidence, as was the case here, is usually not abundant. The exhibits speak for themselves, but must be perused and examined with care. This has been done as to each of the seven exhibits—six magazines and one set of photographs.

An examination of the set of photographs shows various poses of a woman in progressive stages of undress (though never quite naked), which to the normal person might be offensive or repulsive, but they are not necessarily obscene under the statute. And since mere nudity in and of itself is not obscene, we think the trial court in convicting King for selling the photographs was clearly in error as to the evidence.

The same is true with respect to the magazine *Black Garter*. Most of the pictures in this magazine are of models who pose for "glamor" photography. They are portrayed scantily dressed either in black lingerie or white furs and other accessories in what might be described as coarsely offensive postures, but the pictures, even though obviously intended to arouse sex appeal, are not strictly obscene. And, which is more to the point with respect to the issue of obscenity, the textual matter accompanying the illustrations is in the main innocuous. Instead, it purports to discuss in detail the technique of using shadows and lights in photographing the nude. Therefore, since this magazine taken as a whole is not obscene, we think the trial court also erred in convicting Monfred, King and the Siegels for selling it.

But when each of the other five so-called "girlie" magazines —*Candid, Consort, Sextet, Cloud 9* and *Torrid*—is taken as a whole, that is, when the pictures reproduced therein are examined in conjunction with a perusal of the textual material, it is apparent that all of these publications are obscene within the meaning of the statute as well as under the obscenity test approved by the majority in the *Roth-Alberts* case, *supra*. All of them, without exception, present numerous pictures or drawings of nude or semi-nude women showing what the State characterized as "come hither" expressions and poses interspersed with pointedly suggestive sex stories so placed that a reader if he needs visual aid in following the story has only to glance at the opposite page for additional stimulation. All of these five publications were obviously calculated to excite lustful thoughts in the mind of the reader.[3] Thus, having made a determination of our own that the findings of fact were correct, we are unable to say that the trial court was in error as to the evidence in convicting all of the defendants for selling one or more of these magazines; nor did the lower court reach the wrong conclusion as to the law.

―――――

3. *Sextet* (Vol. 1. No. 3), for example, in addition to showing more than fifty pictures and drawings of nude and semi-nude women on its forty-eight pages, also contains eleven articles indexed as "features," "fiction" and "pictorial." Four of such articles

In the *Roth* (and *Alberts*) case, Roth, who was a "rare book" dealer, was convicted of a violation of the Federal obscenity statute. Alberts, who was a distributor of photographs of nude and semi-nude women in various poses, was convicted under the California obscenity statute. In neither case was there any question as to whether or not the books sold by Roth and the photographs distributed by Alberts were obscene in fact. Thus, all that was decided was whether, on their faces, the federal and state statutes under consideration

---

will suffice to demonstrate the intention to arouse prurient interest. Typical extracts from these include the following:

From "His Only Weakness" (a lewd narrative detailing the seduction of a hardened woman by a philanderer):

"That's my proposition * * *. If you want me in bed, now's your one and only chance." (p. 4)
* * *

"Now he was absolutely sure he was going to have [her]. And, if necessary, he would make it by force. Sort of an unlegalized rape." (p. 6)
* * *

"Suppose you let me feel you." (p. 40)
* * *

"He could see her delicious breasts straining against the material of her smart black dress." (p. 40)
* * *

"He didn't say a word. He just nodded his head, leaped forward, grabbed her hand and dragged her into his bedroom.

"When it was over, they lay quietly on the bed * * * naked and exhausted." (p. 41)
From "The Paper Back Girls" (emphasizing the increase in the sexual aspect of cheap literature):

"* * * she is practically a virgin because she has only been to bed with eleven different men, not counting those before she was 13. [She] also confesses her fondness for dykes without giving any count in such regard." (p. 11)
* * *

"'Kiss me * * * I haven't been laid in more than six months * * * she reached up and, with a terrific yank, ripped the front of her dress wide open, baring her breasts * * * rich, sexual woman was everywhere * * *'" (p. 12)
* * *

"The girls round robin it with the men and as circumstances

were violative of the First and Fourteenth Amendments respectively.

In speaking for the majority, Justice Brennan held that both statutes were valid, and, in the process, stated (at p. 489) that the test of obscenity is "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." Material having such an interest was defined in a footnote as "material having a tendency to excite lustful thoughts." The Court also held that "obscenity is not within the area of constitutionally protected speech and press."

Chief Justice Warren concurred in the result reached in each case. His theory was—because it was not the material but a person that was on trial—that what is obscene should depend in the main on the reprehensible conduct of the seller in engaging in "the commercial exploitation of the morbid and

---

permit they pair off and have an even more exciting time with each other." (p. 12)

From "The Cherry Orchard" (a story of a minor seduced by a prostitute):

"Larry's pants bulged with the thought." (p. 17)

\* \* \*

"What a broad to pop with! He swallowed hard and crossed his legs. (p. 18)

\* \* \*

"Her whisper was almost a sexual action. 'Your place or mine?'" (p. 19)

\* \* \*

"She moved her groin hard into his." (p. 19)

\* \* \*

"He pulled her sweater from her shoulder, and she swung around. Nude, except for panties. \* \* \* 'I told you gin makes me passionate.' She kicked off her shoes and flung herself on the bed. \* \* \* 'I'll let you take the panties off. Guys like to do that.'" (p. 19)

\* \* \*

"Seconds later, he became a man." (p. 42)

From "A Date With Judy" (a fantasy of a partially nude woman inviting a man to her house):

"'I'm so happy you could come,' she purrs with a sexy smile and a suggestive pose of welcome.

"Arm and arm they enter the semi-dark apartment." (p. 20)

.

shameful craving for materials with prurient effect" and not on the obscenity of the materials sold. Justice Harlan concurred in the result in *Alberts* and dissented in *Roth*. He was of the opinion that federal obscenity censorship should be limited to hard-core pornography and that the states should be allowed broader censorship powers. Justices Black and Douglas dissented. They were against all obscenity censorship except where it is shown that "the particular publication has an impact on action that the government can control."

In the next term after the *Roth-Alberts* decision, the Supreme Court disposed of several other obscenity cases by short per curiams. In three of them, the Court, by reversing federal courts of appeal—without any explanation for the reversals other than the citation of the *Roth* (and *Alberts*) case—gave final protection to the materials in question. In one, *Times Film Corp. v. City of Chicago,* 355 U. S. 35 (1957), which involved prior censorship of a French cinema with English subtitles based on a novel by Colette, the appellant attacked the Chicago censorship ordinance on the ground that it imposed an unconstitutional prior restraint. The appendix to the appellant's brief indicated that the censors had not taken any of the artistic merits of the film into account, and in fact four of the censors testified that the picture had not aroused their sexual desires, pruriently or otherwise. The appendix further indicated that there was no nudity, other than one short scene showing a boy's buttocks, and that the real reason a permit was denied was to prevent children from seeing the movie. The decision of the appellate court in this case had been handed down before the Supreme Court had decided *Roth*. In the second reversal, *One, Inc. v. Olesen,* 355 U. S. 371 (1958), which involved the right to send the magazine *One*—a publication dealing with homosexuality—through the mails, officials of the Post Office Department had invoked the federal obscenity statute because the magazine was considered to be lewd and obscene. The petition for certiorari in this case had also been prepared before the decision in *Roth*. The government urged that the lower court had satisfied the *Roth* test, but the petitioner contended that the Supreme Court had not theretofore dealt with this specific ques-

tion. A copy of the magazine was not included in the printed record; nor was it reproduced in either of the briefs, but, since the sole question was whether the magazine was obscene —a question of fact—the Court, by citing *Roth,* apparently applied the *Roth* test in determining that the publication was either not obscene or that taken as a whole it was not obscene. In the third reversal, *Sunshine Book Co. v. Summerfield,* 355 U. S. 372 (1958), another case involving the mailing of a magazine—*Sunshine & Health*—a copy of the publication was also not included in the printed record, but it is a "nudist" type magazine—a representative copy of which is included in the transcript in the instant case—in which, although the nudist way of life is advocated and the pictures show the genital areas of the body, there is nothing obscene in the text of the magazine. Thus, it appears that the reversal was based on the concept that mere nudity is not obscenity or the decision may have been based on the fact that the text was not in fact obscene. But in *Adams Newark Theatre Co. v. City of Newark,* 354 U. S. 931 (1957), involving the Newark city ordinances prohibiting lewd, obscene or indecent shows and performances, in which the petitioner had raised issues of vagueness and freedom of expression in a proceeding for a declaratory judgment before the city had attempted to enforce the ordinances, the Supreme Court of the United States, in a brief per curiam, summarily affirmed the judgment of the New Jersey Supreme Court—which had upheld the constitutionality of the ordinances—by citing the *Kingsley* (354 U. S. 436), *Roth* and *Alberts* cases. And, in a fifth case, *Mounce v. United States,* 355 U. S. 180 (1957), the government having made a "confession of error" that the test used by the court of appeals was "materially different" from the *Roth* test, the judgment below was reversed and remanded to the district court for consideration in the light of *Roth.*

We think the *Times Film* case is fairly distinguishable from the instant case in that the censors not only made no effort to apply any sort of reasonable obscenity test, but principally because the main reliance of the appellant was on the "prior restraint" theory rather than the lack of an obscenity test. The *Sunshine Book* case is also easily distinguishable in that,

unlike the instant case, there were no obscene stories in the nudist magazine. And, although the *One, Inc.* case is not as easy to distinguish as the other two, it is a fact that it, like the *Sunshine Book* case, also involved federal postal censorship, not a state criminal prosecution; besides, since the constitutional issue was not formally raised, it is possible that the decision may not have been based on the unconstitutionality of the statute.

Other recent federal obscenity cases also have no direct bearing on the cases before us. In *Butler v. Michigan*, 352 U. S. 380 (1957), decided prior to *Roth*, the Supreme Court merely condemned the Michigan obscenity statute by holding that it was violative of the First and Fourteenth Amendments —in that it prohibited the sale to an adult of a book unfit for a minor—without suggesting a constitutionally sanctioned alternative. In *Kingsley Books, Inc. v. Brown*, 354 U. S. 436 (1957), also decided before *Roth*, where the defendant was convicted under the New York obscenity statute, there was no question but that the material was obscene, and there was no intimation of what was soon to be stated in *Roth*. In *Kingsley Int'l Pictures Corp. v. Regents of the Univ. of N. Y.*, 360 U. S. 684 (1959), which involved the famous motion picture *Lady Chatterley's Lover*, the Supreme Court, without deciding whether or not the picture was obscene, declared that a part of the New York motion picture obscenity statute was unconstitutional in that it violated the basic "freedom to advocate ideas" guaranteed by the First Amendment. And in *Smith v. California*, 361 U. S. 147 (1959), in which the defendant was convicted of having obscene books in his possession, a Los Angeles city ordinance was declared unconstitutional in that it did not require proof of scienter on the part of the possessor, but again, the majority did not pass on the question of whether the books were actually obscene.

Thus, in the cases since *Roth*, the Supreme Court—at least in its majority opinions in the *Kingsley Pictures* and *Smith* cases—did not specifically apply the *Roth* test to the allegedly obscene materials before it in these cases. However, the test seems to have been applied in the per curiam reversals (*Times Film, One, Inc.*, and *Sunshine Book*) and in the per curiam

affirmance *(Adams Newark Theatre)*, but we do not know for sure—other than that the *Roth* test of obscenity will be strictly construed—what the reasoning of the Court was in any of these per curiams.

It may well be that the Supreme Court will in time (assuming it has not already done so) declare that only "hardcore pornography" is not protected by the constitution, as a majority of four of the Court of Appeals of New York (in two opinions—the latter concurring in the result reached in the former—each of which was concurred in by one other judge) did recently in construing the meaning of the obscenity statute of that State in *People v. Richmond County News, Inc.,* 175 N. E. 2d 681 (N. Y. 1960), involving the sale and distribution of the magazine *Gent,* when, in discarding the *Roth* test, it adopted an obscenity test of its own.[4] Or the Supreme Court might eventually accept the concept of "variable obscenity"[5] expressed by Chief Justice Warren in his concurring opinion in the *Roth-Alberts* case to the effect that the question of obscenity must turn, not on the material itself, but on the motives of the seller. In passing—since these sales were unquestionably commercial—we note that a variable obscenity test could have been applied in this case. But, until the Supreme Court specifically speaks further in this uncertain area, we think we are bound by what we understand the *Roth* test requires.

Applying the *Roth* test to the censorship power of the State under the provisions of our obscenity statute, as was done in these cases (although incorrectly with respect to two of the exhibits), it is, as we see it, evident that the conviction of

---

**4.** Judge Fuld in the opinion written by him stated that "the test of the obscene, of the pornographic, is not in the tendency or appeal of the material but rather in its content objectively appraised" and then added that "it [the obscene] focuses predominantly upon what is sexually morbid, grossly perverse and bizarre, without any artistic or scientific purpose or justification."

**5.** This concept seems to have been favored by Dean Lockhart and Professor McClure (of the University of Minnesota Law School) in their scholarly treatise on this area of the law entitled *Censorship of Obscenity: The Developing Constitutional Standards* published in 45 Minn. L. Rev. 5 (1960).

King for selling the set of semi-nude photographs should be reversed; that the convictions of Monfred, King and both Siegels for selling the magazine *Black Garter* should also be reversed; and that the convictions of all of the appellants for selling one or more of the obscene magazines called *Candid, Consort, Sextet, Cloud 9* and *Torrid,* should be affirmed, and we so hold.

> *Judgments against Albert King for selling the set of semi-nude photographs and against Harry Monfred, Albert King, Sander A. Siegel and Benjamin M. Siegel for selling the magazine BLACK GARTER reversed; the mayor and city council of Baltimore to pay one-seventh of the costs.*
>
> *Judgments against all appellants for selling one or more of the obscene magazines CANDID, CONSORT, SEXTET, CLOUD 9 and TORRID affirmed; appellants to pay six-sevenths of the costs.*

HAMMOND, J., filed the following dissenting opinion:

The opinion of the Court in this troublesome case is essentially syllogistic: the Maryland statute proscribing the sale of obscene books and magazines is to be construed as broadly as the Supreme Court will permit; the case of *Roth v. United States,* 354 U. S. 476, 1 L. Ed. 2d 1498, held that obscenity is not protected by the constitutional guarantees of freedom of speech and press, and said that material is obscene if, to the average person, applying contemporary community standards, "the dominant theme of the material taken as a whole appeals to prurient interest;" the trial judge found the magazines sold by the defendants appealed to "prurient interest" and, since this Court cannot say he was clearly wrong in his determination, the judgments and sentences of guilty must be affirmed. I find the premises and the deductive process unsound, and the conclusion therefore necessarily

wrong and am constrained to dissent and express my reasons for disagreement.

The only testimony against each defendant was that he had sold the magazine or pictures introduced against him. There was no testimony as to contemporary community standards (except that the magazines had been sold openly in Baltimore for five years), or as to what comprises a community, or as to what effect the pictures and magazines would have on the average person. The Court held the separate group of pictures and those in the magazines not to be in themselves obscene (and with these holdings I agree), but decided that most of the texts, considered with the related pictures, justified Judge Sodaro in finding the magazines obscene under the *Roth* standards, as the Court understands them. Despite the Court's statement that its determinations were independent, this is no more in actuality than holding that "Judge Sodaro thought that most people would think the magazines obscene, we cannot say he was wrong and therefore, under the Maryland statute and the Constitutional tests, they are obscene."

In deciding the case on this basis the Court, I think, failed to fulfill its obligatory duty to make a reflective independent appraisal of the controversial printings, for as Justice Harlan, concurring in *Roth,* said (as to the suppression of obscenity) at p. 497-498 of 354 U. S.: "* * * the question of whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind." A State appellate court, no less than the Supreme Court, has the same obligation. *The People, etc. v. Richmond County News, Inc.* (N. Y.), 175 N. E. 2d 681; Lockhart and McClure, *Censorship of Obscenity: The Developing Constitutional Standards,* 45 Minn. L. Rev. 114-120; 4 Davis, *Administrative Law,* 29.08; *Niemotko v. Maryland,* 340 U. S. 268, 271, 95 L. Ed. 267; *Feiner v. New York,* 340 U. S. 315, 316, 95 L. Ed. 267; *Napue v. Illinois,* 360 U. S. 264, 271, 3 L. Ed. 2d 1217; *Watts v. Indiana,* 338 U. S. 49, 93 L. Ed. 1801. Since *Roth,* cases that have recognized this obligation include *United States v. Keller,* 259 F. 2d 54 (3rd Cir.); *Capitol Enterprises, Inc. v. City of Chicago,* 260 F. 2d 670 (7th Cir.); *Commonwealth v. Moniz* (Mass.), 155 N. E. 2d 762.

That the publications here involved are a form of vulgar and tawdry entertainment (for some part of the populace), lacking in all social value or artistic or scientific justification, does not deprive them of the constitutional protection of free speech and press. In *Winters v. New York*, 333 U. S. 507, 510, 92 L. Ed. 840, the Court, noting its obligations as to an aspect of a free press (comic crime books) "in its relation to public morals" said: "We do not accede to appellee's suggestion that the constitutional protection for a free press applies only to the exposition of ideas. The line between the informing and the entertaining is too elusive for the protection of that basic right. * * * What is one man's amusement, teaches another's doctrine. Though we can see nothing of any possible value to society in these magazines, they are as much entitled to the protection of free speech as the best of literature." *Hannegan v. Esquire*, 327 U. S. 146, 158, 90 L. Ed. 586, said: "What seems to one to be trash may have for others fleeting or even enduring values."

The concept of obscenity in law is a complex and difficult one. I take it the Maryland Legislature intended by its use of "obscene" in the statute (Code (1960 Cum. Supp.), Art. 27, Sec. 418 (a)) what the word meant in prevailing leading legal thought; otherwise it would be too vague to constitute a permissible standard in a criminal statute.

In *The People, etc. v. Richmond County News, Inc., supra,* the Court of Appeals of New York, in holding a "girlie" magazine (indistinguishable from the worst of those in the case before us) not to be obscene, said of the New York statute (the equivalent of the Maryland section) (at p. 685 of 175 N. E. 2d 681):

> "In the *Roth* case (354 U. S. 476, * * * *supra*), the court did say that 'obscene material is material which deals with sex in a manner appealing to prurient interest' (* * * p. 487 * * *), and that the test was 'whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest' (* * * p. 489 * * *). These statements, however, can only indicate the broad boundaries of any

permissible definition of obscenity under the United States Constitution; they do not pretend to, and cannot, give specific content to the meaning of 'obscene' as it appears in our statute."

In the *Roth* opinion the phrase "appeal to prurient interest" was lifted from a more comprehensive definition in the American Law Institute's Model Penal Code, Tentative Draft No. 6, Sec. 207.10(2) (a definition which the Court seemingly adopted as sound): "* * * A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i. e., a shameful or morbid interest in nudity, sex or excretion and if it goes substantially beyond customary limits of candor in description or representation of such matters * * *." The authors of Model Penal Code continue:

"We reject the prevailing test of tendency to arouse lustful thoughts or desires because it is unrealistically broad for a society that plainly tolerates a great deal of erotic interest in literature, advertising, and art, and because regulation of thought or desire, unconnected with overt misbehaviour, raises the most acute constitutional as well as practical difficulties. We likewise reject the common definition of obscene as that which 'tends to corrupt or debase.' If this means anything different from tendency to arouse lustful thought and desire, it suggests that change of character or actual misbehaviour follows from contact with obscenity. Evidence of such consequences is lacking * * *."[1]

---

1. The Court of Appeals of New York comments on the last statements in The People, etc. v. Richmond County News, Inc. (N. Y.), 175 N. E. 2d 681, saying: "It is noteworthy that, despite the reams of material on the effect of books, magazines and other media of expression on sexual conduct, 'there is very little scientific evidence' on the subject. (St. John-Stevas, Obscenity in the Law (1956), p. 196; see, also, Brown v. Kingsley Books, 1 N. Y. 2d 177, 181, fn. 3; United States v. Roth, 237 F. 2d 796, 812-817, per Frank, J., concurring, affd. 354 U. S. 476). Indeed, two authoritative writers in the field have concluded that, 'Although the whole subject of obscenity censorship hinges upon the unproved

The Supreme Court of Oregon in a careful opinion in *State v. Jackson,* 356 P. 2d 495, 507, adopted the Model Penal Code definition of obscenity as the meaning of the Oregon statute on the subject, and said:

> "On the other hand, the Model Penal Code, by requiring that the material, to be obscene, must appeal to 'prurient interest' and go 'substantially beyond customary limits of candor in description or representation' emphasizes strongly that the manner of presentation must itself amount to shameful and disgusting conduct outside the pale of what is tolerable to the community at large. The majority opinion in the Roth case defines 'prurient' as 'having a tendency to excite lustful thoughts.' 354 U. S. 476, at page 486, note 20, 77 S. Ct. at page 1310. We think, however, that the court had in mind the narrower meaning used by the Model Penal Code or means to use the narrower meaning in cases following Roth."

The *Roth* case unquestionably established two constitutional tests of obscenity: (1) the material must be judged as a whole and (2) it must be judged under contemporary community standards by its impact upon average or normal persons, not the young, the weak, or the susceptible. There can

---

assumption that "obscene" literature is a significant factor in causing sexual deviation from the community standard, no report can be found of a single effort at genuine research to test this assumption by singling out as a factor for study the effect of sex literature upon sexual behavior.' (Lockhart and McClure, Obscenity and the Courts, 20 Law and Contemporary Problems, 587, 595; see, also, American Law Institute, Model Penal Code, Tentative Draft No. 6, Sec. 207.10, p. 44). Some commentators have gone even further and suggested that 'for an undetermined number of individuals, the writing or reading of obscenity may be a substitute for rather than a stimulus to physical sexuality.' (American Law Institute, Model Penal Code, Tentative Draft No. 6, Sec. 207.10, p. 45)." The suggestion in these writings is that there is no causal connection between what is regarded as "obscene" and antisocial conduct of a sexual nature.

be little doubt, I believe, that "community standards" means not state or local communities but rather the standards of society as a whole.[2] The phrase originated with Judge Learned Hand in his opinion in *United States v. Kennerley,* 209 F. 119, 121: "* * * should not the word 'obscene' be allowed to indicate the present critical point in the compromise between candor and shame at which the community may have arrived here and now? * * * To put thought in leash to the average conscience of the time is perhaps tolerable, but to fetter it by the necessities of the lowest and least capable seems a fatal policy." It seems plain Judge Hand was referring not to the standards of states or local communities, but rather to the contemporary standards of society as a whole, and that the Supreme Court had in mind that same standard in adopting the phrase. Messrs. Lockhart and McClure so interpret the *Roth* opinion. They say in their article *Censorship of Obscenity* at p. 111 of 45 Minn. L. Rev.:

---

2. Manifestly local community standards as to what is or is not obscene vary to a considerable degree. What a jury in the more unsophisticated sections of Maryland—in some parts of the Eastern Shore and in more remote Southern and Western Maryland—might consider beyond the pale, a jury in Baltimore or the metropolitan counties of the State might find acceptable. Lockhart and McClure in their article in 45 Minn. L. Rev. 5 point out at page 36 that "In Los Angeles, New York, and perhaps also Chicago, the Post Office and Justice Departments had difficulty convicting persons for mailing obscene matter; courts and juries there were too sophisticated, their attitudes too liberal * * * the two departments supported the enactment of legislation authorizing prosecution of a mailer at any place through which the mail passed, as well as at the place of receipt of the mail. It would be easier to obtain convictions and heavier sentences in the hinterland * * *." The authors add at page 109 that "At trials in more straight-laced communities, the government could make particular effective use of such trial tactics as refusing to consent to waivers of jury trials; and then, having insisted on jury trials, it could peremptorily challenge the most literate and best educated jurors. If 'contemporary community standards' has reference to the standards of state or local communities, and if those standards are to be applied by a jury, then these tactics will enable the government to secure convictions which heretofore would have been difficult or impossible to obtain."

"* * * We believe the Supreme Court did not, as some of the proponents of censorship hopefully thought, approve of the application of state or local community standards in obscenity cases. Indeed, in one of its per curiam decisions after the *Roth-Alberts* opinion, the Court indicated that it would not tolerate the application of restrictive local standards in obscenity censorship."

The error into which the trial judge and majority of this Court fell, in my view, was to confuse and equate sex (and vulgarity, crudeness and cheap, poor taste) with obscenity. They are not synonymous and society as a whole and the courts recognize this. The subject matter, the descriptions and references found in the magazines held obscene in this case can be found in much the same form in literally hundreds of novels and stories which have either been accepted as not obscene or have been found not to be. The Supreme Court in *Roth* emphasized the necessity of differentiating between sex and lewdness:

"However, sex and obscenity are not synonymous. * * * The portrayal of sex, e. g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press. Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." (p. 487 of 354 U. S., p. 1508 of 1 L. Ed. 2d)

I do not believe the trial judge permissibly could have been convinced beyond a reasonable doubt that the contents of the magazines, judged by the contemporary standards of our society as a whole, both appealed to "a shameful or morbid interest" in nudity or sex and at the same time went "*substantially* beyond customary limits of candor in description or representation of such matters." [3] As the American Law

---

3. The Court found "Black Garter" not to be obscene. "Consort"

Institute said, we live today in "a society that plainly tolerates a great deal of erotic interest in literature, advertising and art." Judge Bryan made the same point in finding "Lady Chatterley's Lover" not obscene in *Grove Press, Inc. v. Christenberry*, 175 F. Supp. 488:

> "The tests of obscenity are not whether the book or passages from it are in bad taste or shock or offend the sensibilities of an individual, or even of a substantial segment of the community. * * * (p. 501)

> "* * * the broadening of freedom of expression and of the frankness with which sex and sex relations are dealt with at the present time require no discussion. In one best selling novel after another frank descriptions of the sex act and 'four-letter' words appear with frequency. These trends appear in all media of public expression, in the kind of language used and the subjects discussed in polite society, in pictures, advertisements and dress, and in other ways familiar to all. Much of what is now accepted would have shocked the community to the core a generation ago. Today such things are generally tolerated whether we approve or not." (p. 502)

I agree with the conclusion of the Court of Appeals of New York in its holding that the "realistic accounts of normal sexuality" in the magazine "Gent" (in which, as Judge Froessil makes plain in his dissenting opinion by extensive quotations and description, the language and pictures were as direct and crude and vulgar as any in the magazines before us) was not obscene. Judge Fuld said for the Court at p. 686 of 175 N. E. 2d:

> "The fact is, however, that, while the magazine contains many stories or pictures which are aesthet-

---

and "Torrid" would not seem to be any more so under any reasonable test of obscenity. "Candid" and "Sextet" have one or two stories approaching the obscene and almost all of "Cloud 9" is on the borderline.

ically tasteless and without any redeeming social worth, none of them is pornographic. Numerous pictures and cartoons of nude or semi-nude women and numerous descriptions and depictions of sexual arousal and satisfaction are to be found in 'Gent' but it contains nothing which smacks of sick and blatantly perverse sexuality."

Chief Judge Desmond, concurring, said at pp. 687-688:

"This collection of sexy fiction and illustrations has little of literary merit or artistry and yet it is not in the First Amendment sense filthy or disgusting or deliberately corruptive or offensive to common decency under prevailing standards of taste. Virtuous adults will reject it (as all of us Judges would were we not restrained by the *Roth-Alberts* legal test). Adolescents may be hurt by it. But our prepossessions are not the law and the reactions of children are not valid tests (*Roth v. United States,* 354 U. S. 476, 489, 490, * * * supra)."

Whether the Court's reading of the Maryland statute, or mine, is correct as a matter of interpretation may well be immaterial. I am convinced that the Supreme Court has left no constitutional leeway to make the interpretation the majority makes and that its result violates the constitutional rights of the defendants and the publishers of free speech and free press.

In seeking to go to the Supreme Court, *Roth* raised four issues of substance—whether (a) the federal statute violated first amendment guarantees; (b) was too vague; (c) invaded the reserved powers of the States and the people; and, finally, (d) whether the publications were obscene. Roth seriously pressed only the first three; his argument on the fourth was so perfunctory the government did not reply. The Court limited the certiorari granted to the first three issues. The *Alberts* case, decided with *Roth,* ended in the Supreme Court in the same posture as *Roth*—at a level of abstraction so rarefied that the facts had become immaterial.

The Solicitor General brought the case to a more earthy

level. In his brief he pointed out that the violations of the Federal obscenity statute fell into three categories. The first, some two per cent, comprised "novels of apparently serious literary intent" challenged because "they concentrate on explicit discussion of sex conduct in a vocabulary based on four letter words." The second category, less than ten per cent, he said was border-line material, mainly photographic. The final group, ninety per cent of the whole, comprised what the Solicitor General described as "black market" or "hard-core" pornography. To make sure the Court knew what he meant by "hard-core pornography" he sent to the Court a carton containing numerous samples concededly in that category.[4]

The foregoing account of the *Roth-Alberts* case was taken from Lockhart and McClure, *Censorship of Obscenity*, 45

---

4. The Solicitor General described "hard-core" pornography as follows:

"This is commercially-produced material in obvious violation of present law * * * This material is manufactured clandestinely in this country or abroad and smuggled in. There is no desire to portray the material in pseudo-scientific or 'arty' terms. The production is plainly 'hard-core' pornography, of the most explicit variety, devoid of any disguise.

"Some of this pornography consists of erotic objects. There are also large numbers of black and white photographs, individually, in sets, and in booklet form, of men and women engaged in every conceivable form of normal and abnormal sexual relations and acts. There are small printed pamphlets or books, illustrated with such photographs, which consist of stories in simple, explicit, words of sexual excesses of every kind, over and over again. No one would suggest that they had the slightest literary merit or were intended to have any. There are also large numbers of 'comic books,' specially drawn for the pornographic trade, which are likewise devoted to explicitly illustrated incidents of sexual activity, normal or perverted * * *. It may safely be said that most, if not all, of this type of booklets contain drawings not only of normal fornication but also of perversions of various kinds.

"The worst of the 'hard-core' pornographic materials now being circulated are the motion picture films. These films, sometimes of high technical quality, sometimes in color, show people of both sexes engaged in orgies which again include every form of sexual activity known, all of which are presented in a favorable light. The impact of these pictures on the viewer cannot easily be

Minn. L. Rev. pp. 19-29. The authors later revert to the subject and conclude (p. 60):

> "In voting to sustain the constitutionality of the obscenity statutes of California and of the United States, Justices Frankfurter, Burton, Clark, Brennan,

imagined. No form of incitement to action or to excitation could be more explicit or more effective.

"Brief for the United States, pp. 37-38, United States v. Roth, 354 U. S. 476 (1957).

"The Solicitor General also sought to distinguish hard-core pornography from material in 'the borderline entertainment area.' He said:

"The distinction between this [hard-core pornography] and the material produced by petitioner and others, as discussed above, is not based upon any difference in intent. Both seek to exploit the erotic market place. The difference is that the 'black-market' traffickers make no pretence about the quality and nature of the material they are producing and offering.

\* \* \*."

D. H. Lawrence wrote in Pornography and Obscenity in Sex Literature and Censorship (1953):

"But even I would censor genuine pornography, rigorously. It would not be very difficult. In the first place, genuine pornography is almost always underworld, it doesn't come into the open. In the second, you can recognize it by the insult it offers, invariably, to sex, and to the human spirit.

"Pornography is the attempt to insult sex, to do dirt on it. This is unpardonable. Take the very lowest instance, the picture postcard sold underhand, by the underworld, in most cities. What I have seen of them have been of an ugliness to make you cry. The insult to the human body, the insult to a vital human relationship! Ugly and cheap they make the human nudity, ugly and degraded they make the sexual act, trivial and cheap and nasty.

"It is the same with the books they sell in the underworld. They are either so ugly they make you ill, or so fatuous you can't imagine anybody but a cretin or a moron reading them, or writing them."

The Kronhausens in Pornography and The Law 178-243 (1959) say pornographic books "are always made up of a succession of increasingly erotic scenes without distracting non-erotic passages. These erotic scenes are commonly scenes of willing, even anxious seduction, of sadistic defloration in mass orgies, of incestuous relations consummated with little or no sense of guilt, of super-permissive parent figures who initiate and participate in the sexual ac-

and Whittaker must have had material of this kind in mind for hard-core pornography, particularly in pictorial form, is so blatantly shocking and revolting that it would have been impossible for the Justices to put it out of mind. Since the basic issue before the Court was only the constitutionality of the statutes on their faces and in a vacuum, without regard to their application in the two cases, it seems likely that the Court upheld their constitutionality as imaginatively applied to hard-core pornography.

"We conclude, therefore, that the concept of obscenity held by most members of the Court is probably hard-core pornography, a conclusion consistent with the Court's 'rejection of obscenity as utterly without redeeming social importance.' "

This view is strongly confirmed by the per curiam decisions which followed *Roth* on distinctly mundane levels. In each on the citation of *Roth* the Court reversed United States Court of Appeals decisions that had upheld obscenity censorship, and demonstrated that in *Roth* it had placed really very tight restraints on what can constitutionally be censored as obscene.

The views of Messrs. Lockhart and McClure as to the meaning of *Roth* undoubtedly are shared by the Court of Appeals of New York which, in *The People, etc. v. Richmond County News, Inc., supra,* clearly indicated its interpretation of the New York statute as reaching only "hard-core" pornography was compelled by the *Roth* and the per curiam holdings.

---

tivities of their children, of profaning the sacred, of supersexed males and females, of Negroes and Asiatics as sex symbols, of male and particularly female homosexuality, and of flagellation, all described in taboo words. The sole purpose of pornographic books is to stimulate erotic response, never to describe or deal with the basic realities of life."
(As summarized by Lockhart and McClure, Censorship of Obscenity, 45 Minn. L. Rev. 63-64)

See also the graphic description of the illicit traffic in "hard-core" pornography detailed in Chapter 1 of James Jackson Kilpatrick's "The Smut Peddlers" (1960).

Chief Judge Desmond, concurring in the *Richmond* case, said so in so many words, and, concurring in *Kingsley Inter. Pic. Corp. v. Regents of Univ. of N. Y.* (N. Y.), 151 N. E. 2d 197, 207-208, observed that the Supreme Court in the per curiams must have looked at the challenged material and found it not obscene under *Roth*. Other cases which would seem to have shared the same views include those in the footnote below.[5]

One of the significant per curiams which followed *Roth* was *Times Films Corp. v. City of Chicago*, 355 U. S. 35, 2 L. Ed. 2d 72. The Court of Appeals described the motion picture "The Game of Love," held obscene by it, as follows:

> "We found that, from beginning to end, the thread of the story is supercharged with a current of lewdness generated by a series of illicit sexual intimacies and acts. In the introductory scenes a flying start is made when a 16 year old boy is shown completely nude on a bathing beach in the presence of a group of younger girls. On that plane the narrative proceeds to reveal the seduction of this boy by a physically attractive woman old enough to be his mother. Under the influence of this experience and an arrangement to repeat it, the boy thereupon engages in sexual relations with a girl of his own age. The erotic thread of the story is carried, without deviation toward any wholesome idea, through scene after scene. The narrative is graphically pictured with nothing omitted except those sexual consummations which are plainly suggested but meaningfully omitted and thus, by the very fact of omission, emphasized. * * *
>
> "We do not hesitate to say that the calculated purpose of the producer of this film, and its dominant

---

5. Excelsior Pictures Corp. v. City of Chicago, 182 F. Supp. 400 (N. D. Ill.); Commonwealth v. Moniz (Mass.), 155 N. E. 2d 762; City of Cincinnati v. Walton (Ohio), 145 N. E. 2d 407; United States v. Keller, 259 F. 2d 54 (3rd Cir.); People v. Silberglitt, 182 N. Y. S. 2d 536.

effect, are substantially to arouse sexual desires. We are of the opinion that the probability of this effect is so great as to outweigh whatever artistic or other merits the film may possess. We think these determinations are supported by the effect which this film would have upon the normal, average person." (244 F. 2d 432, 436)

A second appeal, *One, Inc. v. Olesen,* 355 U. S. 371, 2 L. Ed. 2d 352, was from the decision of the Court of Appeals of the Ninth Circuit, holding the magazine "One" and the advertisement in it of the magazine "Circle" which contained pictures and stories of homosexuality and lesbianism obscene. The Court of Appeals described its findings in this way:

"The article 'Sappho Remembered' is the story of a lesbian's influence on a young girl * * *. This article is nothing more than cheap pornography calculated to promote lesbianism. It falls far short of dealing with homosexuality from the scientific, historical and critical point of view.

"The poem 'Lord Samuel and Lord Montagu' is about the alleged homosexual activities of Lord Montagu and other British Peers and contains a warning to all males to avoid the public toilets while Lord Samuel is 'sniffing round the drains' of Piccadilly (London). The poem pertains to sexual matters of such a vulgar and indecent nature that it tends to arouse a feeling of disgust and revulsion. It is dirty, vulgar and offensive to the moral senses. * * *

"An examination of 'The Circle' clearly reveals that it contains obscene and filthy matter which is offensive to the moral senses, morally depraving and debasing, and that it is designed for persons who have lecherous and salacious proclivities.

"The picture and the sketches are obscene and filthy by prevailing standards. The stories 'All This and Heaven Too', and 'Not Til the End', pages 32-36, are similar to the story 'Sappho Remembered',

except that they relate to the activities of the homosexuals rather than lesbians. Such stories are obscene, lewd and lascivious. They are offensive to the moral senses, morally depraving and debasing." (241 F. 2d 772, 777, 778)

The third case, *Sunshine Book Co. v. Summerfield,* 355 U. S. 372, 2 L. Ed. 2d 352, involved a nudist magazine. The Court of Appeals quoted with approval the language of *Sunshine Book Co. v. McCaffrey,* 112 N. Y. S. 2d 476, 483, that:

"Where the dominant purpose of nudity is to promote lust, it is obscene and indecent. The distribution and sale of the magazines in this case is a most objectionable example. The dominant purpose of the photographs in these magazines is to attract the attention of the public by an appeal to their sexual impulses. * * * Men, women, youths of both sexes, and even children, can purchase these magazines. They will have a libidinous effect upon most ordinary, normal, healthy individuals. Their effect upon the abnormal individual may be more disastrous." (249 F. 2d 114, 118, 119)

The Supreme Court must have made an independent examination of the material in each case and found that censorship offended constitutional privileges for the Court simply reversed on the citation of *Roth,* and so terminated the litigation and gave final protection to the material.

The material it protected had been thought obscene by the lower court judges, applying what they deemed to be the contemporary standards of the average or normal person. Yet the Supreme Court, as I interpret its actions, held the pictures and writings were not obscene under the *Roth* standards. I can only conclude that as of now the Supreme Court will permit the proscription only of hard-core pornography and I find nothing in the magazines before the Court coming within that category.

The Supreme Court in *Roth* (p. 488 of 354 U. S., p. 1509 of 1 L. Ed. 2d) said, speaking of "the fundamental freedoms

of speech and press," that "Ceaseless vigilance is the watchword to prevent their erosion by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests."

The background of *Roth,* and the three per curiams that followed, lead me to conclude that the door has been opened very slightly for the censors—not enough to permit them to get at the magazines in this case—and that the *Roth* standard, as understood and applied by the Supreme Court, is a very tight standard, reaching only "hard-core" pornography. If I am right the application of the Maryland statute, applied as the majority has applied it in this case, was unconstitutional.

I would reverse the judgments appealed from.