JOSEPH BRINTON DILLINGHAM *v.* STATE
OF MARYLAND

[No. 314, September Term, 1969.]

*Decided July 15, 1970.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Joseph Forer* for appellant.

*Robert A. DiCicco, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Linthicum, Jr., State's Attorney for Montgomery County,* and *Barry H. Helfand, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

THOMPSON, J., delivered the majority opinion of the Court. ORTH, J., concurs. ANDERSON, J., dissents. Concurring opinion by ORTH, J., at page 700 *infra.*

Joseph Brinton Dillingham, the appellant, was convicted under Art. 27, § 418 of the Md. Code which prohibits the sale, exhibition, etc., of obscene pamphlets or drawings. He was originally convicted in the People's Court for Montgomery County. On appeal to the Circuit Court for Montgomery County, he was again convicted by a jury in a *de novo* trial. We granted *certiorari.* Dillingham contends the evidence did not establish the required elements of obscenity; since we agree with this contention, it will be unnecessary for us to consider the other contentions.

On March 21, 1969, appellant was arrested in front of the Montgomery County Police Headquarters for selling a detective an issue of the *Washington Free Press* newspaper, Vol. 2, No. 52, March 15-31, 1969. On page three of the issue, at the top of the page in bold block letters approximately one inch high, there is the headline "Dear Judge Pugh" and in smaller print "pages 9-15". On page nine of the issue, in white letters approximately one and one-eighth inch high, on a black background, there is the headline "A Pornobiography." In the lower center portion of that page, there is a cartoon approximately four and one-quarter inches square which shows a nude human figure (purported to be Judge James H. Pugh of

the Circuit Court for Montgomery County) masturbating. The cartoon shows the human figure sitting on a large chair with a swastika on it, in front of a podium or lectern on which are hanging various items such as a hypodermic needle and a whip. The entire cartoon, including the human figure, is a line-type drawing, being very simple artistically and out of natural proportions. The human figure is abstract in an artistic sense, bearing only moderate resemblance to actual human form. The limbs and general anatomy are out of proportion, there is no hair on the head, and the face is expressionless. Above the figure but within the four and one-quarter inch square of the cartoon is the caption "HE' COMM D'JUDJE" [sic]. Surrounding the cartoon in a box ten inches by four and three-quarter inches is a biography of personal facts concerning Judge Pugh, *e.g.*, club memberships, home address, and alleged conflicts of interests. Surrounding the cartoon and biographical material on the rest of the page is a critique in hostile terms of Judge Pugh in his professional capacity; the entire page measures seventeen inches by approximately eleven and one-half inches. Page nine is one of twenty-four pages in the total newspaper. Pages 10 to 15 are apparently intended as a continuation of the critique of the judicial system in general begun on page nine. A summary of the newspaper and the expert testimony is shown in the appendixes.

In applying § 418 of Art. 27, Md. Code, the proper criteria to determine obscenity is outlined in *Roth v. United States,* 354 U. S. 476, 77 S. Ct. 1304, 1 L.Ed.2d 1498. In reference to that test, this Court stated in *Donnenberg v. State,* 1 Md. App. 591 at 597-598, 232 A. 2d 264 at 268-269:

> "We understand the *Roth-Alberts* definition of obscenity—'whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to the prurient interest'—as reiterated in *Jacobellis v. Ohio,* 378 U. S. 184, elaborated

in *Ginzburg v. United States,* 383 U. S. 463, adjusted in *Mishkin v. New York,* 383 U. S. 502 and summarized in *A Book Named 'John Cleland's Memoirs of a Woman of Pleasure' v. Attorney General,* (the Fanny Hill decision) 383 U. S. 413 establishes the following test for obscenity:

"Three elements must coalesce; it must be established that:

"1) The dominant theme of the material taken as a whole appeals to a prurient interest in sex.

 a) where the material is designed for and primarily disseminated to a clearly defined deviant sexual group, rather than the public at large, the prurient-appeal requirement is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group.

"2) The material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters.

"3) The material is utterly without redeeming social value.

Each of the above three federal constitutional criteria must be applied independently and neither be weighed against nor canceled by any of the others.

 a) As an aid to determining the question of obscenity, the setting in which the material was presented may be considered. Thus evidence of pandering—'the business of purveying textual or graphic matter openly advertised to appeal to the erotic interest—is relevant' and 'where a purveyor's

> sole emphasis is on the sexually pro-
> vocative aspects of his publications, a
> court could accept his evaluation on
> its face value.' "

It has been uniformly recognized by this Court, the Court of Appeals and the United States Supreme Court that the reviewing court has the obligation to make an independent, reflective constitutional judgment on the facts. *Jacobellis v. Ohio, supra, Wagonheim v. Maryland State Board of Censors,* 255 Md. 297, 258 A. 2d 240, *Sanza v. Maryland State Board of Censors,* 245 Md. 319, 226 A. 2d 317, *Levin v. State,* 1 Md. App. 139, 228 A. 2d 487, *Donnenberg v. State, supra, Lancaster v. State,* 7 Md. App. 602, 256 A. 2d 716.

## I "Taken As A Whole"

In making a constitutional judgment, this case demands special analysis of the requirement that the allegedly obscene material be "taken as a whole." There may be some question as to what is the proper "whole", but there is general agreement that consideration of the "whole" is not restricted to the first test set out above. The annotation in 5 A.L.R.3d 1158 "Modern Concept of Obscenity" at 1178-1179 summarizes the situation:

> "§ 7. Judging material 'as a whole'
> "[a]  Generally
> "The earlier standard under which obscenity could be judged by the effect of an isolated excerpt taken from a book or other writing was rejected in the Roth Case, [supra] which requires that material challenged as obscene must be judged 'as a whole.'
> * * *
> "[b]  Where text is accompanied by illustrations
> "Whether illustrations challenged as obscene may be considered apart from the accompanying text seems a question which depends upon the circumstances of the individual case. In any

event, at the present time there is not sufficient authority on the point to make it possible to state generalized rules."

While the Supreme Court has never defined "whole" specifically, in *Roth v. United States, supra,* and *Ginzburg v. United States,* 383 U. S. 463, 86 S. Ct. 942, 16 L.Ed.2d 31, the Court cites with apparent approval the trial court's approach that the allegedly obscene item must be considered in its entire context which is, at an apparent minimum, the physical item itself. In *Roth,* 354 U. S. at 490, 77 S. Ct. at 1312, the Court approves the trial court's instructions:

> " 'The books, pictures and circulars must be judged as a whole, in their entire context, and you [the trier of fact] are not to consider detached or separate portions in reaching a conclusion.' "

Thus, insofar as the Supreme Court has considered the issue, it seems they intend the trier of facts to consider at least the entire physical item that is allegedly obscene.

Cases from the Maryland Court of Appeals provide more guidance. In *Monfred v. State,* 226 Md. 312, 173 A. 2d 173 (1961) cert. den., 368 U. S. 953, 82 S. Ct. 395, 7 L.Ed.2d 386, the Court specifically considered the textual material in conjunction with the illustrations. With regard to one set of exhibits the Court said at 226 Md. at 317, 173 A. 2d at 174-175:

> ". . . the pictures, even though obviously intended to arouse sex appeal, are not strictly obscene. And, which is more to the point with respect to the issue of obscenity, the textual matter accompanying the illustrations is in the main innocuous. Instead, it purports to discuss in detail the technique of using shadows and lights in photographing the nude. Therefore, since this magazine taken as a whole is not obscene, we

think the trial court also erred in convicting [the defendants] for selling it."

See also *Yudkin v. State*, 229 Md. 223, 182 A. 2d 798.

In obscenity cases this Court has in each considered at least the entire physical item before deciding the issue of obscenity. In *Levin v. State, supra,* the question involved three sets of three photographs. While the Court did not view every photograph, it did review a photograph introduced as representative of the set from which it came; there was no accompanying text. In *Donnenberg v. State, supra,* the Court specifically considered the five and one-half pages of "pseudo-intellectual" text accompanying the illustrations. In *Lancaster v. State, supra,* this Court viewed the entire film; the film contained no auditory or textual portion.

Thus, the rule appears to be established in Maryland that the trier of fact and the reviewing appellate court must consider at least the entire physical item that is allegedly obscene before deciding whether the entire physical item constitutes a proper "whole" and before deciding obscenity.

A similar approach is used by other state and federal decisions which recognize that the proper "whole" varies from case to case, but is usually no less than the entire physical item. Thus, in *Zenith International Film Corporation v. Chicago,* 291 F. 2d 785, (7th Cir. 1961), the Court while mainly concerned with fair procedures emphasized that in a licensing procedure for films, the publication could not be judged on the basis of scenes isolated from the rest of it. In *Ackerman v. United States,* 293 F. 2d 449, (9th Cir. 1961), it was held that the writings of serious authors on subjects of public concern may not be judged merely by selecting words or phrases but must be considered as a "whole." Thus in *Ackerman* the Ninth Circuit considered the dominant theme of letters and enclosed pictures together in deciding whether defendant had mailed obscene material. The Court in *United States v. 1,000 Copies of a Magazine Entitled "Solis",* 254 F.

Supp. 595 (U.S.D.C., Md., 1966) read the fifteen pages of text besides the title page and viewed the eighteen full page pictures of nude women before concluding that the magazine in question "is dominantly and essentially a picture book of nude women and that it is designed for . . . men and boys who would be interested in such pictures." The Court clearly required that text and illustrations be considered together, although indicating worthless pictures might not be salvaged by socially worthwhile text.

The Courts in *Hadelman v. United States,* 340 F. 2d 59 (10th Cir. 1965) (concerning the sale of sex manuals which had no illustrations), *In Re Louisiana News Company,* 187 F. Supp. 241 (U.S.D.C., La., 1960), and *William Goldman Theatres, Inc. v. Dana,* 405 Pa. 83, 173 A. 2d 59 (1961) *cert. den.,* 368 U. S. 897, 82 S. Ct. 174, 7 L.Ed.2d 93, (holding Pennsylvania's movie censorship law of 1959 unconstitutional saying, *inter alia,* the law allowed censoring part of a movie isolated from the rest), all stated obscenity could not be decided on the basis of isolated excerpts. In *Books, Inc. v. United States,* 358 F. 2d 935, (1st Cir. 1966), the Court held it was relevant when considering the physical item to consider both front and back covers as part of the "whole".

However, while in items involving both words and illustrations, the two must be considered together, several cases have indicated that the mere insertion of innocuous text will not salvage otherwise obscene illustrations. In *Donnenberg v. State, supra,* five and one-half pages of innocuous text did not prevent this Court from finding the material obscene. A similar result was reached in *United States v. 1,000 Copies of a Magazine Entitled "Solis", supra.*

A reasonable position is that of *Flying Eagle Publications, Inc. v. United States,* 285 F. 2d 307 (1st Cir. 1961), wherein the Court said the jury must consider the "whole" including the text, but the jury is not controlled in its interpretation of the illustrations by the text. *Flying Eagle* points out the distinction between allowing the

jury to ignore the accompanying text and allowing the jury after considering the text to decide that it is not part of the "whole" that should be considered in determining the dominant theme for obscenity.

However, other cases point out that in dealing with certain obscenity problems the consideration of merely the entire physical item is insufficient. In those cases the court must look beyond the physical item to surrounding circumstances which are relevant to the "whole." In *Ginzburg v. United States, supra,* the circumstances of presentation of the item, including dissemination, advertising, publisher's attitude of pandering, commercial setting, and open commercial exploitation of erotica were part of the relevant "whole." In *Donnenberg v. State, supra,* this Court held the "purveyor's sole emphasis" on the obscene was a relevant consideration within the "whole" of the *Roth* test. In *Sanza v. Maryland State Board of Censors, supra,* the Court of Appeals held that it was relevant to consider the neighborhood in which a movie was to be shown as part of the "whole".

A consideration of the entire physical item that is allegedly obscene is a starting point in delineating the "whole". Numerous factors beyond the physical item may be considered when relevant.

## II "Taken As A Whole" In The Instant Case

Looking at the facts in this particular case, we start by deciding whether to consider the cartoon alone; the cartoon in conjunction with the box of biographical material of the judge; the cartoon and all of page nine of this issue; the cartoon and the entire 24 page newspaper; or the cartoon, the entire 24 page newspaper, and certain relevant factors beyond the newspaper itself. We hold that the proper "whole" is the cartoon in conjunction with the entire newspaper and other relevant outside considerations. We think the cartoon is inextricably bound to the iconoclastic nature of the entire periodical. While we most emphatically disagree with the ideas expressed in this periodical, there is no suggestion they were not

678

sincerely held, or more importantly, were inserted merely to provide a pseudo-intellectual background for the publication of the cartoon. While different topics are considered in the different articles of the newspaper, their attitudes and ideas are uniform throughout.

We must recall that we are not considering tastefulness, accuracy of criticism, or social worth beyond the minimum amount required by the *Fanny Hill* decision.[1] We must bear in mind that it is, in fact, a newspaper which tries in its own puerile style to communicate ideas to the public. This cartoon is part of a six page critique which the publishers have presented to the public. In view of the historical importance of criticism of public officials by the media, especially newspapers, this Court will not lightly hold obscene such a critique by considering it independent from the rest of the paper although, we repeat, we may not be of accord with its ideas.

A reading of the newspaper shows that there are no other pictures in any way relating to sex acts. Although there is frequent use of common four letter Anglo-Saxon profanities dealing with sex and excretion, these are not used in a way to direct attention to the sex act or excretory act itself, but are rather employed to describe ideas or as exclamations. Hence, the inartistic cartoon of a man masturbating is the only illustration or text directly related to sex or excretion. The paper generally tries to report items of current interest and make comments on the alleged inequities of society.

It also appears that this newspaper was not disseminated in such a way as to cater to members of society who would have an interest in buying a picture of a man masturbating. Instead it appears that the periodical in-

---

1. *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General*, 383 U. S. 413, 419, 86 S. Ct. 975, 978, 16 L.Ed.2d 1. "The Supreme Judicial Court erred in holding that a book need not be 'unqualifiedly worthless before it can be deemed obscene'. A book cannot be proscribed unless it is found to be *utterly* without redeeming social value. This is so even though the book is found to possess the requisite prurient appeal and to be patently offensive."

tended to attract subscribers who shared its iconoclastic attitude towards society.

## III Social Worth

The instant case is unusual if not unique since the allegedly pornographic cartoon purports to criticize a public official. This Court is unaware of any other case in which the object of the alleged obscenity is an elected public official. We find no direct guidance in either case law or statutory law for dealing with obscenity involving public figures.

Under the facts presented, this Court must note that the person depicted in the cartoon is an elected public official and that the surrounding text directs its caustic criticism at that officer's performance of his official duties. While appellant was convicted of an obscenity violation, the involvement of a public official introduces the relevance of those Supreme Court cases which define the increased breadth of the constitutionally protected privilege to discuss public officials' conduct. In *New York Times Company v. Sullivan*, 376 U. S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686, a civil case in which a city commissioner sued several defendants for libel based on a paid "editorial advertisement", the Court said at 376 U. S. at 279, 84 S. Ct. at 726:

> "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

The Court considered the defamatory criticism:

> ". . . against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include ve-

hement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. * * * The constitutional protection does not turn upon 'the truth, popularity, or social utility of the ideas and beliefs which are offered.' *N.A.A.C.P. v. Button,* 371 U. S. 415, 445, 83 S. Ct. 328, 344, 9 L.Ed.2d 405." 376 U. S at 270, 84 S. Ct. at 721.

Having started with a civil defamation action, the Supreme Court extended the special consideration of criticism of public officials in *Garrison v. Louisiana,* 379 U. S. 64, 85 S. Ct. 209, 13 L.Ed.2d 125, a criminal case involving criticism of judges, wherein the Court said in 379 U. S. at 67, 85 S. Ct. at 212:

"At the outset, we must decide whether, in view of the differing history and purposes of criminal libel, the New York Times rule also limits state power to impose criminal sanctions for criticism of the official conduct of public officials. We hold that it does.

"Where criticism of public officials is concerned, we see no merit in the argument that criminal libel statutes serve interests distinct from those secured by civil libel laws, and therefore should not be subject to the same limitations."

Also in *Garrison,* the Supreme Court, 379 U. S. at 73, 85 S. Ct. at 215, n. 9, noted the law of privacy recognizes severe limitations where public figures or newsworthy facts are concerned. In *Rosenblatt v. Baer,* 383 U. S. 75, 86 S. Ct. 669, 15 L.Ed.2d 597, the Court more specifically defined the term public official, saying:

"It is clear, therefore, that the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the

conduct of governmental affairs." 383 U. S. 85, 86 S. Ct. 676.

In *Curtis Publishing Company v. Butts,* 388 U. S. 130, 87 S. Ct. 1975, 18 L.Ed.2d 1094, the Supreme Court again broadened *New York Times v. Sullivan* by including "public figures" in addition to public officials.

The Court's dedication to wide-open, caustic debate has been repeatedly voiced in a variety of postures. See *Watts v. United States,* 394 U. S. 705, 89 S. Ct. 1399, 22 L.Ed.2d 664; *St. Amant v. Thompson,* 390 U. S. 727, 88 S. Ct. 1323, 20 L.Ed.2d 262; *Pickering v. Board of Education,* 391 U. S. 563, 88 S. Ct. 1731, 20 L.Ed.2d 811; and also *Brukiewa v. Police Commissioner,* 257 Md. 36, 263 A. 2d 210 (1970).

Of particular relevance to wide-open debate in the instant case are the comments of the Supreme Court in *Bridges v. State of California,* 314 U. S. 252, 62 S. Ct. 190, 86 L. Ed. 192, a prosecution for contempt of court for allegedly attempting to interfere with pending litigation. In *Bridges,* the Court said, 314 U. S. at 270, 62 S. Ct. at 197:

> "The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect."

See *Pennekamp v. Florida,* 328 U. S. 331, 66 S. Ct. 1029, 90 L. Ed. 1295, another contempt case involving an alleged attempt to influence judicial administration in which the Court followed *Bridges; Pennekamp* is noteworthy in that it involves a cartoon critical of judicial

administration. In *Pennekamp,* as in *Bridges,* the convictions were reversed. In *Craig v. Harney,* 331 U. S. 367, 67 S. Ct. 1249, 91 L. Ed. 1546, another contempt of court case based on an editorial allegedly too harsh in its criticism of a local judge, the Court commented on the nature of judges, 331 U. S. at 376, 377, 67 S. Ct. at 1255.

> "Judges are supposed to be men of fortitude, able to thrive in a hardy climate. * * * Judges who stand for reelection [as they do in Maryland] run on their records. That may be a rugged environment. Criticism is expected. Discussion of their conduct is appropriate, if not necessary."

Insofar as the articles in the *Free Press* criticize a judge, they seem to be well within the area of criticism allowed by the Supreme Court in *Bridges, Craig,* and *Pennekamp.* While it is true that in the instant case we are dealing with an obscenity charge and not a contempt of court conviction, this Court cannot overlook the important fact the *Free Press* was making criticisms which, at least on their face, are protected by the constitutional right of free speech. It is true, of course, the first amendment shield is removed as to criticism which is known to be false, or is made with reckless disregard of the truth thereof, as pointed out in *New York Times Company v. Sullivan, supra;* but we cite the libel and contempt cases only to show the social value of criticism, even though inaccurate, of public officials. Although Freudian concepts of sexual motivation for human conduct, as expressed by the cartoon, have come under fire recently, they are not so discredited that this Court could say those ideas are utterly without social worth. Through the centuries, those in authority have attempted to repress many ideas that have later been widely accepted, as for example the ideas of Eugene Debs, Copernicus, Galileo and Darwin. See *Epperson v. Arkansas,* 393 U. S. 97, 89 S. Ct. 266. One of the basic purposes of the first amendment is to protect ideas of the minority. While to us, the idea a

judge can get any kind of sexual gratification from the performance of his judicial duties is farfetched, we think the idea is well within the first amendment protection.

The State produced only one direct expert as to redeeming social value, a parish priest, who based his opinion on the proposition that criticism of a judge could have social value only if supported by strong evidence. Assuming the priest to be a competent expert, this concept is obviously contrary to the rationale of the cases we have heretofore cited. All of the defense experts testified the cartoon, in context, did have redeeming social value.

The State cites as controlling precedent *Levin v. State, supra,* wherein this Court was called to rule upon the obscenity of photographs depicting nude males, each with a large penis in full erection. The State emphasizes that here, as there, there is an emphasis on the male genitalia. The Court's decision that the photographs in *Levin* were obscene is clearly distinguishable from the present case. The photographs in *Levin* were presented without any accompanying text whereas here there is not only considerable text but also an attempt at a critique of a judicial system, however distasteful, vulgar, revolting, shallow or inaccurate that critique might be. Thus, the two cases have little in common.

On this record, in making our independent constitutional determination of the facts, *Donnenberg v. State, supra,* we must hold the trial judge should have granted the motion to acquit because the allegedly obscene material was not utterly without redeeming social value.

### IV  Community Standards

We have heretofore quoted the three tests set out in *Donnenberg v. State, supra,* but for clarity we repeat the community standards test which also must be met before obscenity can be found.

"The material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters."

There is some controversy as to whether the standard

to be applied is national or local, but we will not discuss this question because the record here shows the material does not affront either standard. *Donnenberg v. State, supra,* 1 Md. App. 591, 598-599, 232 A. 2d 264, 268.

Of the State's three purported expert witnesses only two, Father Gatta and Mr. Paulin, testified on the community standards issue. The former's conclusion that the cartoon violated contemporary standards was not based upon knowledge of other publications concerning sexual matters available either nationally or locally, but upon what he had been told, what he thought most people would dislike plus his own theological and moral ideas. This testimony is obviously valueless in determining the question as to community standards. Mr. Paulin based his opinion as to community standards on the simple basis that the cartoon depicted a public exhibition of sex. This testimony also fails to be of any assistance on the question at issue, which is, what other material relating to sexual matters is openly available in the community.

Three of the four defense experts, whose qualifications were not objected to, testified as to community standards, citing *Portnoy's Complaint, Playboy* and *Esquire* magazines, the movie "I am Curious-Yellow" (which is available in many parts of the country but not yet locally, see *Wagonheim v. Maryland State Board of Censors,* 255 Md. 297, 258 A. 2d 240, *sub nom., Grove Press, Inc. v. Maryland State Board of Censors,* 397 U. S. 984, 90 S. Ct. 1115, 25 L.Ed.2d 393, U. S. , 90 S. Ct. 1496, 25 L.Ed.2d 682; 399 U. S. 903, 90 S. Ct. 2191, 26 L.Ed.2d 558), and sexual art works on display in art galleries, including those of Rembrandt and Picasso. In addition the defense introduced copies of *Portnoy's Complaint* and *The Collected Drawings of Aubrey Beardsley,* both of which had been openly purchased in Montgomery County, Maryland.

The books, magazines, the movie and the works of art cited deal as frankly with sexual matters as the cartoon and, in general, are openly available nationally as well as locally. It seems extremely doubtful the State could produce any contrary evidence on this question if the

issue were to be retried. On this record, in making our independent constitutional determination of the facts, *Donnenberg v. State, supra,* we must hold the trial judge should have granted the motion to acquit because the allegedly obscene material does not affront contemporary community standards, either national or local, in that other material, readily available, deals with sexual matters in an equally frank manner.

## V  Appeal to Prurient Interest

The principal definition of prurient interest in sex for legal purposes comes from *Roth, supra,* 354 U. S. at 487, 77 S. Ct. at 1310, n. 20, wherein the Supreme Court defines it as "a tendency to excite lustful thoughts * * * itching; longing; uneasy with desire or longing; . . . morbid . . ." The basic definition of a prurient interest in sex remains the same although subsequent cases have broadened the scope of inquiry in determining whether an appeal is made to prurient interests. See *Ginzburg v. United States, supra,* and *Mishkin v. New York, supra.*

The prosecution here presents no evidence that would support the finding of an appeal to prurient interests. The witness Oropollo felt that the cartoon appealed to a morbid interest in sex, with morbidity being defined as a pathological state of an organism that interferes with its function. This approach is too broad to fit within the *Roth* definition, which describes a narrower type of reaction, i.e., "itching, longing." Under Oropollo's definition, any number of pathological conditions could justify a finding of morbidity (e.g., a pathological avoidance of all interest in sex) while *Roth* limits prurient interest to uneasy longings or itchings. Further, Oropollo considered the cartoon out of context. Insofar as the witness Father Gatta testified on appeal to prurient interest, he also approached the problem incorrectly. First, he considered the cartoon alone and out of context. Second, he felt the cartoon was obscene merely because it showed a sexual aberration. Third, he balanced the three elements of obscenity one against the other instead of considering

whether all elements, judged independently, coalesced. *Donnenberg, supra.* The last State expert, Leo D. Paulin, felt the cartoon obscene since it depicted a public exhibition of sex. All public depictions of sex do not appeal to prurient interest, since obviously if they were, all public scholarly inquiry into sex would be obscene. See *Roth v. United States, supra,* 354 U. S. at 487, 77 S. Ct. at 1310.

All four defense experts testified directly that there was not only an absence of appeal to prurient interest, but also no appeal to sexual interests at all. All defense experts felt the cartoon was directed at the reader's political feelings and not sexual feelings. As Dr. Gurel, a psychologist, said, "Just because there is a penis there [in the cartoon] doesn't mean that the primary impact of the cartoon is sexual."

Thus, the State did not carry its burden of proving beyond a reasonable doubt that the allegedly obscene cartoon and surroundings appealed to a prurient interest in sex. Since this is a question on which expert opinion could, perhaps, differ, we would remand the case for a new trial if this were the only ground for reversal, but since it is not as set out in III and IV above, we will reverse without a new trial. We repeat, to be obscene, the material must fail all three tests, i.e., it must be utterly without redeeming social value, it must exceed contemporary community standards in depicting sexual matters and must appeal to the prurient interest in sex.

*Judgment reversed without a new trial. Costs to be paid by Montgomery County Council.*

## APPENDIX

### A. Summary of the Newspaper

Those parts of the *Free Press* most directly connected with the cartoon, after the headline "Dear Judge Pugh" on page three, begin on page nine (the same page as the cartoon) and continue to page 15, although interrupted with other articles and full page drawings.

On page nine the opening sentences declare the *Free Press'* attitude toward Judge Pugh, i.e., he is not judicially impartial and operates as a prosecutor not a judge. In the following article of approximately 24 paragraphs (14 of which are presented in quotes as the words of Pugh himself) the paper tries to substantiate this accusation. As their first example they cite the 1961 rape trial of the Giles brothers. After reporting in quotes a colloquy between Pugh and John Giles, the *Free Press* lists the errors of Pugh and the prosecutor, indicating the case was reversed by the United States Supreme Court. Their next example is a 1967 burglary trial of a man named Barnes. They claim Pugh prejudiced the jury by referring to newspaper articles, and the severe sentence was because Barnes lived in the District of Columbia. Their final example in this section is the rape case of Gordon Leon Contee wherein, according to the *Free Press,* Pugh manifested racial bias. The article indicates the Court of Appeals granted a retrial.

The remainder of the article is divided into three subdivisions indicated by underlined headings. The subheadings are: (1) Pugh on paranoia, conspiracy and Walter Washington; (2) Pugh on censorship and freedom, 1961; and (3) Pugh on picketing, 1965.

In the first subdivision, the *Free Press* indicates, through a quote, Pugh's feeling that criminals come into Montgomery County from the District of Columbia and that Pugh gives severe sentences intending to keep the criminals in Washington.

In the second subdivision on censorship, the *Free Press* quotes from *Yudkin v. State* involving Henry Miller's

book, *Tropic of Cancer*, to indicate Pugh as trial judge felt his prurient interest was aroused by the book in question. The article quotes Pugh as saying to Yudkin : ". . . . The only thing the court can conclude is that you were trifling with your liberty. . . ." to which the *Free Press* responded, "Who is trifling with whom here? How does one trifle with one's own liberty?"

In the subdivision on picketing, the article presents several quotes purportedly from Pugh, to the effect that while there is a right of petition, that right does not include trying to influence the behavior of public officials. The *Free Press* felt Pugh put a greater emphasis on the empty verbalization of democracy as opposed to the practice of it. The final quote in this section, again purportedly from Pugh but without a source being given, is that Pugh, while admitting a right to picket, did not personally condone it.

. In the center of page nine immediately surrounding the cartoon and set off from the rest of the page by a line is a biographical sketch of Judge Pugh indicating in its first sentence that Judge Pugh has charged the County Grand Jury of Montgomery County to investigate the *Free Press* for subversion. In response to that charge to the Grand Jury, the *Free Press* presents a brief history of Pugh, deciding the most effective rebuttal was the extensive quoting of his own statements [appearing in the larger article outlined above]. Among the facts presented in the biographical sketch are a brief genealogy of Pugh and his wife, his former directorship of a local bank, fraternal affiliations, association with the county draft board, and his home address and phone number with the encouragement to call or visit him bearing gifts.

Turning to pages 10 and 11, page 10 is joined with page 15 in one lengthy article criticizing grand juries. To read the entire article it is necessary to remove pages 10 and 15 from the rest of the newspaper. According to the article the grand jury has three purposes, but fails in each of them.

The first purpose, to serve as the conscience of the com-

munity protecting individuals from unfair prosecution, fails due to the artificial selectivity in the process of selecting jurors, with the alleged result being that young, poor or working people, as well as members of minority groups or those who would suffer from economic hardship due to the low pay of grand jury service, are all effectively excluded, leaving the grand jury mainly a white, middle-class, elderly body of the propertied, managerial classes. The article feels that since these are the people who "run" the country, the grand jury does not serve as a conscience for the majority of the community.

The second purpose of the grand jury, according to the article, is to serve as a watchdog against official misconduct. However, the article feels the grand jury fails in this purpose since, as concluded in its discussion of the first purpose, the people on the grand jury are those who benefit from official misconduct and thus do not want to improve the status quo.

The third purpose of the grand jury, as presented by this article, is to provide an opportunity for citizen participation in government. The article holds this purpose fails since the grand jury has become the prosecutor's rubber stamp. This rubber stamp effect is heightened by the facts that grand juries consist of individuals who are mystified by the technicalities of the law, serve only for brief periods, have no staff except the prosecutor's staff, and are not allowed to hire independent experts.

Moving into a general discussion of the shortcomings of the grand jury, the article states although the grand jury is useless to the defendant, it can be very helpful to the prosecutor in the following ways: (1) By using the body of "ordinary citizens" on the grand jury as a scapegoat — for not bringing controversial indictments which the prosecutor wishes to avoid; (2) That the State's Attorney, by using his access to the grand jury report, may prosecute people in the mass media; (3) As a strategy to avoid allowing the defendant to have a judicial preliminary hearing; (4) That in preparing for trial the prosecutor can force adverse witnesses to talk

to him without full constitutional or judicial protection; and (5) The greater access of the prosecutor to the grand jury transcript as opposed to the defendant.

The article decries the secrecy and "mystery" of grand jury proceedings, specifically the exclusion of the mass media and lawyers for prospective defendants. The article feels that this situation allows coercion of witnesses into making statements that they would not otherwise make.

The remainder of the article deals with strategies with which activists called before grand juries may avoid testifying, such as invoking their fifth amendment rights.

On page 11 the *Free Press* quotes several paragraphs from Pugh's charge to the grand jury to investigate the *Washington Free Press* since, quoting Pugh, it "advocates the destruction of the state. . . ." In the next paragraph the *Free Press* quotes the Declaration of Independence that when a government ceases to perform its proper purposes it is the right of the people to alter or abolish it. These quotes, tied to the material on page nine, strengthen the impression that the *Free Press* believes Judge Pugh should be investigated as subversive and not the *Free Press*.

Pages 12 and 13, joined together, as the center of the paper, are a two page triangular montage in black, white and purple. Appearing in the montage are figures representing the President, a judge, military officers, infantry soldiers and a riot policeman. Intermingled with the figures are consumer goods such as a car, radio, television, washing machine, soda bottle and can, records, hot dogs, and small box-like houses in a pattern. Also appearing are a factory, office building and school with the school flag flying upside down. This part of the montage is capped by an atomic explosion with a dollar sign in the mushroom cloud. Surrounding the explosion is the phrase "out demons" repeated in large print.

A majority of the articles in the remainder of the paper deal with law in society, particularly law as a source instead of a cure for injustice. For example, there are

articles on: A community bail fund, dissemination of information on individual's legal rights, the collection of information concerning alleged police brutality to support actions being brought against the police (this topic appears in several different articles throughout the paper), a biography of an alleged police informer, a column listing alleged violations of law in the arrest and detention of drug suspects, the refusal of witnesses to testify before a Senate investigating committee, the alleged shooting of an innocent person by a Prince George's County police officer, the inappropriate appropriation of federal funds to private firms, a list of Washington war tax resistors i.e., people who are not paying taxes which they feel pay for the war in Vietnam, a lengthy article entitled "Youth verses Law and Order" containing several short paragraphs of alleged inequities in the application of the law, the secrecy and evasiveness of the Central Intelligence Agency, a list of contract awards by the Department of the Defense to four different universities for the development of weapons, and several articles concerning the shortcomings of military justice. The attitude of the articles is uniformly harsh, critical, and iconoclastic.

Appendix B. Summary of Expert Testimony

The State's case in chief included the testimony of three expert witnesses: Ralph P. Oropollo, Father Ernest T. Gatta, and Leo D. Paulin.

Ralph P. Oropollo, a clinical psychologist, received his bachelor's and master's degree in education from Rutgers University. Oropollo spends the bulk of his time in private practice in Washington, D.C., although he had also worked for several police departments in Maryland and other states and for several state institutions in Maryland. Oropollo's opinion of the dominant theme of the material on page nine of the *Free Press,* taken as a whole, was that it appealed to a morbid interest in sex. Morbidity was defined by Oropollo as a pathological state of an organism that interferes with its function. Oropollo felt the cartoon, taken by itself, would show a morbid

interest on the part of the artist drawing the cartoon, and that the artist wanted others to agree with his interests. On cross-examination, it was developed that while Oropollo had read all of page nine, he had not read any of the rest of the issue. When asked on cross-examination whether he had an opinion as to the dominant theme of page nine taken as a whole, Oropollo responded that it was his opinion that page nine was a criticism of an individual who is a judge, and that the cartoon was part of the criticism. Oropollo then said the article's criticism was of the exercise of judicial power; however, the cartoon was not part of this criticism. Oropollo acknowledged that in a primitive way the article and the cartoon, taken together in context, conveyed the idea of the cartoon judge receiving sexual gratification through exercising his powers.

Father Ernest T. Gatta, testifying next for the State, received his undergraduate degree from St. Mary's Seminary. Thereafter he studied sacred theology at that school, receiving an S.T.L. degree, which he described as a theology degree comparable to a master's. Gatta had worked as a parish priest in the Montgomery County area since 1956. As a parish priest, he said he was qualified as an expert on community standards and redeeming social values based on his studies and his encounters with marital and family problems and sex problems from young people. His experience was based primarily on confidential confessions from parishioners and a smaller number of counseling sessions. Although unsure how many people he had actually counseled, Gatta was sure the number was large. Gatta's only familiarity with publications dealing with sex is what he observed, but had not read, on public store racks or what parishioners brought him from time to time; he had done no writing or publishing in this field. Having read some but not all of page nine and the rest of the paper, Gatta stated the cartoon, taken alone and out of context from the accompanying text, exceeded community standards because it showed a misuse of sexual activities. Further, Gatta felt the cartoon had no re-

deeming social value since its primary purpose was the depiction of this sexual misuse; if there were a socially redemptive purpose, when balanced against the sexual misuse, the purpose, was overshadowed. As to social worth, Father Gatta felt that a personal attack on a circuit judge would be worthless. On cross-examination it developed that while he felt aware of what the majority of local residents felt about materials dealing with sex, he was not aware of the limits of what would be allowed or available in the community, having never been exposed to *Esquire* magazine, Philip Roth's book *Portnoy's Complaint* dealing with masturbation, or the movie "I am Curious-Yellow." Gatta acknowledged that what he considered to be an aberration would be affected by his theology and morality rather than by what was available to the local public. Criticisms of judges, Gatta acknowledged, would have social worth if supported by strong evidence. However, Gatta admitted he had not read enough of page nine to decide whether there was sufficient supporting evidence in this article since he was considering the cartoon alone without the surrounding text. Further, he said that any worth in the text, when balanced against the obscenity, was outweighed.

Leo D. Paulin, the State's last expert witness, attended law school for one and a half years but did not finish. Currently, he was the publisher of three advertising locals in Montgomery County. Paulin described himself as an expert in the description of sexual matters in the publishing business, having acquired his expertise through his activities as a publisher, the fact that he glanced at, but did not read, competitive papers, and his public speaking with various community civic groups. Paulin's opinion, after one reading of page nine and looking at some of the other pages of the *Free Press,* was that the cartoon on page nine affronted community standards since the cartoon depicted a public exhibition of sex. On cross-examination, Paulin said his newspapers were 80% advertising with only 20% news, and that he subscribed to no wire service for the papers. When given a *Playboy* maga-

zine of April, 1969, Paulin stated the magazine's cover, the centerfold of "Miss April", and some pictures of Brigitte Bardot in a semi-dressed state were all pornographic. He admitted that *Playboy* and other magazines more pornographic than *Playboy* were readily available in Montgomery County. Also, he acknowledged that he had not read *Portnoy's Complaint* or seen "I am Curious-Yellow." When questioned if there was a political message in page nine and the cartoon, Paulin testified the entire page attacked a judge through his decisions; however, although Paulin admitted it was an attack on the judge's decisions, he concluded that it was a personal attack. He admitted that if there were a message connected with the cartoon in the text, it would be necessary to read the text to get the message. At the close of Mr. Paulin's testimony, the State rested.

The first two witnesses in defense's case in chief introduced two books as defense exhibits: *Portnoy's Complaint* by Philip Roth, specifically describing masturbation, and *The Collected Drawings of Aubrey Beardsley,* which contains drawings of men with penises several feet in length. Both books were purchased at a bookstore operated by the wife of the State's Attorney. A later witness introduced the complete scenario of "I am Curious-Yellow" in book form with over 250 pictures.

The defense presented four expert witnesses: Ronald Gross, Frank Getlein, Dr. Lee Gurel and Rev. Earl Brill. All four defense experts testified on all elements of obscenity, except Dr. Gurel who was not qualified on community standards.

The first expert witness for the defense was Ronald Gross, Editor-in-Chief and Vice-President of the Academy for Educational Development, a non-profit research and consulting organization in the field of educational problems. Gross also teaches contemporary American literature at New York University in New York City, and has written or edited several books, the most recent being *The Arts and The Poor*. He has edited several anthologies of essays and papers on educational problems,

published two volumes of poems including one of graphic poetry, which combines words with pictures. He also has contributed articles and critical essays in several major magazines including the *New York Times Book Review, Harpers,* and *Saturday Review.* He is chairman of the grants committee of the General Semantics Foundation for research in language behavior. Gross has served as a consultant to the U. S. Office of Education, UNESCO, the Association of College and Research Libraries, the *Readers Digest,* the Ford Foundation, and several publishing companies including Simon & Schuster and Dell Publishing Company. In the area of academic awards, Gross stated he was a member of Phi Beta Kappa, scholastic honorary, was a fellow at the Shakespeare Institute in England, and received an award for magazine literary criticism. He stated that in his work as a literary critic, one of his major functions was to ascertain and evaluate the dominant theme of different works. After a brief cross-examination, Gross qualified as an expert on each of the three elements of the obscenity tests.

As to the cartoon, in its context with the surrounding text, Gross felt the dominant theme was that the cartoon judge abused his powers, particularly in cases relating to sexual matters, due to the judge's own sexual preoccupation and, therefore, he was unfit for office. The cartoon, in Gross' opinion, directed attention to the connection between the judge's unfair punishments and his own sexual gratification. Gross felt the theme did not appeal to a prurient interest in sex, nor arouse sexual lust in an average person. As to community standards, Gross testified there was a trend, especially in metropolitan areas, towards more explicit characterization of sexual matters, citing as an example *Portnoy's Complaint.* Gross felt the cartoon on page nine did not exceed contemporary standards with regard to candor in the depiction of sexual activity. Gross stated that he had seen the movie "I am Curious-Yellow" but considered the cartoon more political in nature. As to redeeming social value, Gross felt the cartoon's value was very great, since it exposed abuse of

power by a public official, especially the exercise of political power by the official as an expression of sexual need. Gross cited several examples of other similar criticisms of political behavior starting with modern theatre and going back to ancient Greece. Gross' testimony was not altered by cross-examination.

The next expert witness for the defense was Frank Getlein, who is employed by the *Washington Evening Star* newspaper as an art critic, political columnist and editorial writer. Getlein stated he had been an art critic and columnist for approximately 22 years, the last eight with the *Evening Star*. His art column is syndicated to between 40 and 50 newspapers including the *Boston Globe, New York Evening Journal,* and the *Detroit Free Press.* Getlein has published between 12 and 20 books in the art field, including many monographs on individual artists. One of his books entitled *Bite of the Print* is, by his own report, the leading book in the field of satire and irony in prints, being used as a text or reference book in many colleges and institutions including the Smithsonian. He is currently working on several other books to be published. He considered his specialty to be the relationship between art and politics, defining politics in a broad sense to include social ideas and values.

Getlein stated he had read the entire issue of the *Free Press.* In evaluating the cartoon's dominant theme in context, Getlein, after his initial response of laughter, felt the theme of the cartoon is that the judge, identified in the text but not the cartoon, expressed himself sexually through the severity of his decisions, especially those involving sex. The cartoon, according to Getlein, contended the judge used his severe decisions as a means of sexual expression. The cartoon did not, even remotely, appeal to prurient interest. To Getlein, the sexual element in the cartoon was used to convey a political message, i.e., an attack on a political person. To Getlein, this cartoon and its approach of criticizing political officials through sexual or scatological references is at least 500 years old, going back to the beginning of printing. Before printing,

Getlein felt this expression of criticism could be shown in stone and wood carvings as in ancient cathedrals. Getlein felt the cartoon did not go beyond the limits of candor allowed in generally available works of art dealing with sex, citing several art works on display in prominent art galleries. However, on cross-examination, Getlein indicated that his newspaper, and probably many other respected newspapers, would not print this cartoon. On redirect it was pointed out that the same newspapers that would not print this cartoon would probably also not print many works of art depicting sexual matters by recognized masters, including Rembrandt and Picasso. Getlein acknowledged that art magazines and newspapers with more selective circulation than the *Evening Star* would probably publish the works of art masters depicting sexual activity. When given the definition of hardcore pornography from *Donnenberg v. State*, 1 Md. App. 591, 600, Getlein testified this cartoon was not even remotely connected to hardcore pornography.

Dr. Lee Gurel, the next defense expert, received a bachelor's degree from Clark University, a master's degree and doctor's degree from Purdue University, with all degrees being in psychology. Currently he is employed by the Veterans Administration as a psychologist. His professional experience included working in the psychological service of a general medical hospital, being chief psychologist in a neuropsychiatric hospital, and directing the evaluation of psychiatric programs and treatment. He taught at the University of Colorado and is a consultant for the Albert Einstein College of Medicine in New York City. Dr. Gurel has published between 40 and 45 learned articles in professional journals, and presented approximately thirty papers at professional meetings of psychologists. His articles have appeared in, among others, the journals of the *American Psychological Association* and the *American Psychiatric Association,* plus the *Archives of Neurology and Psychiatry,* the *American Journal of Psychiatry, Journal of Counseling Psychology.* He is a member of the American Psychological Associa-

tion, the Eastern Psychological Association, Maryland Psychological Association and the District of Columbia Psychological Association. Gurel is certified to practice as a psychologist in Maryland.

As to the *Washington Free Press*, Dr. Gurel looked at the cartoon and read the entire issue of the newspaper. His opinion was that the dominant theme of the cartoon viewed in context was that a judge, identified as Judge Pugh, derives a sadistic sexual satisfaction from his activities as a judge. Dr. Gurel testified that the validity of this psychological concept has been long recognized and dates back to classical works in psychology. When asked if this cartoon in context would stimulate sexual lust or lascivious thoughts in an average person, Gurel responded:

> "I can hardly conceive of the possibility that this cartoon would arouse lust and lascivious thoughts in the average person. . . . I don't think it [the cartoon] has very much to do with sex at all. Just because there is a penis there doesn't mean that the primary impact of the cartoon is sexual. * * * I don't think that the cartoon is sexually stimulating at all."

When comparing the cartoon with the April, 1969, *Playboy* magazine, Dr. Gurel stated the magazine, its cover, centerfold, and pictorial essay on Brigitte Bardot were all more stimulating than the cartoon. When questioned about masturbation, Dr. Gurel stated that masturbation is practiced by practically 100% of the male population, citing Kinsey's study that 96% of the males admitted masturbating. In direct response to the testimony for the State by Oropollo that he, by looking at the cartoon, was able to conclude that the artist was suffering from morbidity, Dr. Gurel testified that, excluding Oropollo, he knew of no reputable psychologist who would make such a simplistic evaluation based on a single piece of evidence. He further emphasized that evaluating a drawing done by a cartoonist intending to create something artistic is

completely different from drawings done in a clinical interview. He cited journal articles supporting his statements. When asked his opinion as a psychologist whether the cartoon in its context had any social redeeming value, Gurel responded, "I think that the cartoon portrays very well the idea that there can be hidden motivation being expressed in some kind of common activity."

On cross-examination, Gurel stated it would be difficult for him to imagine anyone being stimulated sexually by looking at the cartoon, and that considering the cartoon both in and out of content, he could not conceive of it being sexually stimulating even to a male homosexual.

The last expert for the defense was Rev. Earl Brill, whose education consisted of a B.A. degree from the University of Pennsylvania, a bachelor of theology from the Philadelphia Divinity School, a master of theology from Princeton Theological Seminary, and the recent completion of the requirements for a Ph.D. degree in American intellectual history at American University in Washington, D. C. Brill is the Episcopalian chaplain at the American University and a professorial lecturer in American civilization. During the ten years he has been chaplain, Brill has done considerable counseling with students, frequently on the topic of sex. Brill published several books including *Sex is Dead and Other Post Mortems.* One of his principal interests is the relationship of attitudes with values, and ethics with morals. He stated he was aware of the graphic arts and literature available in the greater Washington area as they related to his analysis of culture. He testified that he had seen "I am Curious-Yellow", and read *Portnoy's Complaint.*

As to the *Washington Free Press,* Rev. Brill read all of page nine, read the pages between nine and 15 in this issue, and skimmed the rest of the issue. In his opinion the dominant theme of the cartoon on page nine taken in context was a political attack on Judge Pugh for the reasons outlined in the accompanying text, i.e., that he derived sexual satisfaction from the misuse of his judicial powers. Further, Brill testified this theme would not

possibly arouse prurient interest in sex. He did not feel the cartoon exceeded the limitations of candor in depicting sex. As to redeeming social value, Rev. Brill felt that the cartoon clearly had social value as a political criticism of the administration of justice in Montgomery County. He concluded his direct examination by saying:

> "Now, whether you regard the administration of justice as adequate or inadequate, it's very clear that the American political tradition calls for us to submit our political institutions to continual scrutiny and criticism, and for that reason such criticism [as within this cartoon] does indeed have redeeming social value."

On cross-examination, Brill stated that although the attack focuses on Judge Pugh, it is not a personal attack but rather a political attack. When asked about the cartoon alone separate from the text, Brill responded that he considered pages nine through 15 a unit. After establishing that some depictions could be obscene, Rev. Brill stated that he did not consider this one to be obscene.

ORTH, J., concurring:

I concur in the judgment of the Court because I agree that the evidence was not sufficient to sustain the conviction. Although it is clear that appellant sold the newspaper containing the offending cartoon, the evidence did not establish the *corpus delicti*—that the cartoon was obscene. The case is confounding because in the usual concept of the word the cartoon is obscene. An impartial jury of appellant's peers did in fact find it obscene and I have little doubt but that a reasonable man, so often called upon in the criminal law, even though cautious and prudent as he is, would so consider it. Left to his own devices he would be inclined to apply the dictionary definition of obscene. Certainly a crude drawing of a judge, sitting on the bench, his judicial robes askew, the fly of his pants open, his genitalia exposed, his large penis in

full erection grasped in his hand in the act of masturbation, with the double-entendre caption "HE' COMM D' JUDJE" (sic)[1] is offensive to accepted standards of decency or modesty, is indecent, is repulsive to the senses, is lewd, is loathsome,[2] and especially so when hawked to the general public on the public street. But what may be obscene by application of a dictionary meaning of obscene is not necessarily what is obscene by application of the constitutional interpretation of the word. The Supreme Court has established that a State may not constitutionally inhibit the distribution of material as obscene unless 1) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; 2) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and 3) the material is utterly without redeeming social value, emphasizing that the three elements must coalesce, and that no such material can be proscribed unless it is found to be *utterly* without redeeming social value. This test of obscenity arose from the definition in *Roth v. United States*, 354 U. S. 476, as reiterated in *Jacobellis v. Ohio*, 378 U. S. 184, elaborated in *Ginzburg v. United States*, 383 U. S. 463, adjusted in *Mishkin v. New York*, 383 U. S. 502 and summarized in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure"* (Fanny Hill), 383 U. S. 413. The opinions in those cases were rendered with no real unanimity among the members of the Court and have left the law of obscenity in a deplorable state. *Jacobellis* is illustrative. The judgment of the Court—that the material was not obscene—was announced by Mr. Justice Brennan. He delivered an opinion in which only Mr. Justice Goldberg joined. He reiterated the *Roth* test. Mr. Justice White merely concurred in the judgment. Mr. Justice Black, joined by Mr. Justice Douglas, concurred in the judgment and for reason restated his view, shared

1. "COME.* * * *Vulgar*. To experience orgasm." The American Heritage Dictionary of the English Language (1969).
2. "OBSCENE. * * * 1. Offensive to accept standards of decency or modesty. 2. Inciting lustful feelings; indecent; lewd. 3. Offensive or repulsive to the senses; loathsome. *Id.*

702

by Mr. Justice Douglas, that freedom of the press and speech safeguarded by the First Amendment and made obligatory on the States by the Fourteenth Amendment preclude censorship in whatever form. Mr. Justice Stewart concurred in the judgment. But he had come to believe that "under the First and Fourteenth Amendments criminal laws in this area are constitutionally limited to hard-core pornography." He did not attempt to define further the kinds of material he understood to be embraced within that shorthand description, stating, "[A]nd perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that." 378 U. S. at 197. I observe that it would be rather difficult for any court on this basis to determine whether material was hard-core pornography; such determination would have to be based on whether Mr. Justice Stewart would know the material to be hardcore pornography when he saw it. And Chief Justice Warren in his opinion asked, "But who can define 'hard-core pornography' with any greater clarity than 'obscenity'?" 378 U. S. at 201. The Chief Justice joined by Mr. Justice Clark, dissented. Because he felt that "no government—be it federal, state, or local—should be forced to choose between repressing all material, including that within the realm of decency, and allowing unrestrained license to publish any material, no matter how vile", there must be a rule of reason. The Court in *Roth* attempted to provide such a rule. 378 U. S. at 200. But the Chief Justice would commit the enforcement of this rule to the appropriate state and federal courts, and he would accept their judgments made pursuant to the *Roth* rule. He would supply "a sufficient evidence" standard of review —"requiring something more than merely any evidence but something less than 'substantial on the record [including the allegedly obscene material] as a whole.' * * * This is the only reasonable way I can see to obviate the necessity of this Court's sitting as the Super Censor of all the obscenity throughout the Nation." 378 U. S. at 202-203. Mr. Justice Harlan also dissented. He would dis-

tinguish between the Federal Government and the States. As to the former, he would apply the *Roth* standards as amplified in his opinion in *Manual Enterprises, Inc. v. Day*, 370 U. S. 478. As to the latter he would make the federal test one of rationality. "I would not prohibit them from banning any material which, taken as a whole, has been reasonably found in state judicial proceedings to treat with sex in a fundamentally offensive manner, under rationally established criteria for judging such material." 378 U. S. at 204. On that basis he felt that the State acted within permissible limits in condemning the film. What we have discussed with regard to the opinions in *Jacobellis* is with respect only to the various notions of the Justices as to the basic meaning of the First Amendment guarantee of free speech and press. As shall be pointed out, there were also differences expressed in the opinions as to the meaning of terms used in the *Roth* test itself. It is not surprising that Mr. Justice Black observed: "No one, including this Court, can know what is and what is not constitutionally obscene * * * under this Court's rulings." [3] In any event it is the *Roth* test, as set out according to our understanding of it in *Donnenberg v. State*, 1 Md. App. 591, 598, which must be applied in determining whether or not material is obscene. Except for hardcore pornography, which is such that no other proof, other than the viewing of it is required to determine that it is obscene since it speaks for itself and screams aloud for all to hear that it is obscene, see *Levin v. State*, 1 Md. App. 139 and *Donnenberg v. State, supra*, at 600, I am constrained to conclude that it is practically impossible for the State to meet the burden of proof required of it to show that material is obscene. This is because of the nature of the three elements which must coalesce for material to be obscene, the manner of proving them, and the scope of appellate review with regard to them.

The first element is that the dominant theme of the

---

3. In his opinion concurring in *Associated Press v. Walker* and dissenting in *Curtis Publishing Co. v. Butts* (decided in one opinion) 388 U. S. 130, 171.

704

material taken as a whole appeals to a prurient interest in sex. The key word is "prurient". This adjective is defined in The American Heritage Dictionary of the English Language (1969) as "1. Obsessively interested in improper matters, especially of a sexual nature. 2. Characterized by such an interest; *prurient thoughts*. 3. Arousing or appealing to such an interest; *prurient literature."* Thus that the material involves sex is not enough. It must arouse an *obsessive* interest in improper matters of a sexual nature. "Prurient" derives from the Latin *pruriens,* present participle of *prurire,* to itch, yearn for, be lascivious. So in *Roth v. United States, supra,* note 20 at 487, material which deals with sex in a manner appealing to prurient interest is characterized as "material having a tendency to excite lustful thoughts." The pertinent part of the definition in Webster's New International Dictionary (Unabridged, 2d ed. 1949) is given: "* * * Itching; longing; uneasy with desire or longing; of persons, having itching, morbid or lascivious longings; of desire, curiosity, or propensity, lewd * * *."

The second element is that the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters. It is patent that the community standards must be ascertained before it can be determined whether or not the material affronts them. But there is no majority of the Supreme Court, disclosed by the opinions to this time, who are in agreement as to whether "community" means national, local or some other geographical designation. Mr. Justice Brennan in his opinion in *Jacobellis* did not see how any "local" definition of "community" could properly be employed in delineating the area of expression that is protected by the Federal Constitution. 378 U. S. at 193. Expressly rejecting that the constitutional question of obscenity is to be determined in each case by the standards of the particular local community from which the case arises, he said: "[T]he constitutional status of an allegedly obscene work must be determined on the basis of a national standard. It is after all

a national Constitution we are expounding." 378 U. S. at 195. Three justices, in *Jacobellis,* including Chief Justice Warren, indicated that it should be a local community. Four justices remained silent on the issue. The Chief Justice in his opinion stated that he believed that "there is no provable 'national standard' " and said that "perhaps there should be none." He observed: "At all events, this Court has not been able to enunciate one, and it would be unreasonable to expect local courts to define one." He felt that when the Court in *Roth v. United States,* 354 U. S. 476, said that obscenity is to be defined by reference to "community standards", it meant community standards, not a national standard. I also feel that there is no provable national standard. Communities throughout the Nation are diverse and I can see no sound reason why a standard adopted by one community must be forced on another community even though, as the Chief Justice recognized and accepted, "such a 'community' approach may well result in material being proscribed as obscene in one community but not in another." 378 U. S. at 200. The designation of certain acts as crimes has never been uniform throughout the States. But is the local community to be the State? Or should "community" for the purpose of a standard for obscenity be further broken down so as to consist of separate areas within the State? Conceivably what affronts the standards of a rural community in a State may not affront the standards of one of its big city communities. The mores and morals of the one community may be substantially different than those of the other. I simply point out that we are in the position of not only lacking an answer to the question as to what the Supreme Court means by "community" but that there are directly conflicting opinions among the justices as to what "community" means. How can the element be proved when the terms in which it is stated are not defined?

I have further difficulty with "community standard", be it national or local. I am in accord with Judge Learned Hand's thoughts in *United States v. Kennerley,* 209 F.

119, 121 (D.C.S.D.N.Y. 1913) as quoted in the Brennan opinion in *Jacobellis*, 378 U. S. at 192-193. A community standard is "the average conscience of the time." "Obscene" indicates "the present critical point in the compromise between candor and shame at which the community may have arrived here and now." Thus the precise morals of an age and place are not embalmed; "while they presuppose that some things will always be shocking to the public taste, the vague subject matter is left to gradual development of general notions about what is decent." But the *Roth* test does not allow a gradual development of general notions about what is decent. It prescribes what is obscene and by so doing it establishes the community standard. It permits no compromise between candor and shame arrived at freely by the community but foists a standard on the community by telling it what it cannot prohibit. I know of no way to determine a community standard than by ascertaining what the community permits. "[T]he community cannot, where liberty of speech and press are at issue, condemn that which it generally tolerates." Opinion of Mr. Justice Harlan, concurring in part and dissenting in part, *Smith v. California*, 361 U. S. 147, 171. Now the community must tolerate what the *Roth* test says it cannot prohibit and this sets the standard. I am persuaded that much of the pornography so apparent today in movies, legitimate theatre, literature and the personal conduct of individuals appears to be accepted by the community, not because it is decent to the average conscience of the time, but because the constitutional definition of obscenity obliges the community to accept it. In short, the standard is established by the test and the test can be applied only with relation to the standard.

The third element is that the material is utterly without redeeming social value. "Utterly" permits of no degree; it means "completely; absolutely; entirely" [4] and

---

4. The American Heritage Dictionary of the English Language (1969).

"to an absolute or extreme degree: to the full extent: * * * altogether, * * * fully, thoroughly, totally." [5] One is hard pressed to find material that can be said to be utterly without redeeming social value. But see *Levin v. State, supra,* and *Lancaster v. State,* 7 Md. App. 602. And it may have some redeeming social value even though it in fact offends contemporary community standards relating to the description or representation of sexual matters and even though, or perhaps, because, it appeals to a prurient interest in sex. Obscenity is excluded from the constitutional protection only because it is "utterly without redeeming social importance", and "[t]he portrayal of sex, e.g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press." *Roth v. United States, supra,* at 484. Mr. Justice Brennan said in *Jacobellis*: "It follows that material dealing with sex in a manner that advocates ideas, * * * or that has literary or scientific or artistic value or *any other form of social importance,* may not be branded as obscenity and denied the constitutional protection. Nor may the constitutional status of the material be made to turn on a 'weighing' of its social importance against its prurient appeal, for a work cannot be proscribed unless it is 'utterly' without social importance." 378 U. S. at 191 (citations omitted; emphasis supplied).

With regard to the manner of proving the three elements which must coalesce before a State may prohibit material as obscene, the Court of Appeals has stated that ordinarily neither the judge who may sit on the circuit court nor the judges of the appellate court would be qualified to determine whether the elements or any of them are absent as to given material without enlightening testimony, for judges are not literary experts or historians or philosophers. *Sanza v. Board of Censors,* 245 Md. 319, 330; *Dunn v. Board of Censors,* 240 Md. 249, 255. This enlightening testimony must come from expert witnesses.

5. Webster's Third New International Dictionary of the English Language Unabridged (1968).

"The average person, however, is certainly not qualified to give expert testimony in this area. The fact that he might have a degree in education, sociology or theology does not, per se, make him qualified; nor does the mere fact that he is a social worker, a probation officer, a teacher, a priest, minister or rabbi. Something more is required. He need not, of course, be an authority but there must be an affirmative showing [and an opportunity to cross-examine thereon] that he is possessed of some special and sufficient knowledge and information, however acquired, which would elevate his opinion above the realm of conjecture, speculation or personal reaction, in respect of any one of the three elements of the test promulgated in *Roth* and expanded most recently in *Fanny Hill*. His knowledge and information may have been acquired in his business or in his profession or it might be the by-product of an avocation, sport or hobby. He may have sought it assiduously or he may have absorbed it casually. * * * The term 'expert' has many lights and shadows. It can denote a man who is recognized authority and, perhaps as accurately, a fellow who once went to the city. At what point between those two extremes he will be allowed to express an opinion on the witness stand will be for the trial judge to decide in the first instance. But whatever his status in life may be, his qualifications can not be assumed; they must be established by evidence. The quality or quantity of that evidence occasionally may require some adjustment, depending upon the exigencies of the moment, and in such circumstances the trial judge will need to exercise the full measure of his judgment, skill and discretion." *Hewitt v. Board of Censors*, 243 Md. 574, 585-586.

Ordinarily whether a witness is qualified to express an

opinion on the subject as to which he is called to testify, is a matter for the trial court to pass upon in the first instance and the court's ruling will not be reversed unless it is shown to have been based upon an error of law or to have been the result of an abuse of judicial discretion. *Yudkin v. State,* 229 Md. 223. "In obscenity litigation, however, this Court will be required to scrutinize more closely the rulings of the trial judge with respect of the qualifications and competency of witnesses offered as experts. * * * The trial judge must be mindful, therefore, of our obligation to assess his rulings in this regard in light of their objective correctness instead, merely, of determining whether he has, or has not, abused his discretion or that he is in error as to the law." *Hewitt v. Board of Censors, supra,* at 582-583. That persons who qualify as experts under *Hewitt* are hard to come by is shown by the detailed discussion in the *Hewitt* opinion of the witnesses offered as experts who testified in that case. Eight were found by the Court as not qualified to express an opinion as an expert. The Court felt that four others "might in appropriate circumstances, be able to qualify as expert witnesses in the area of obscenity." But it found it unnecessary to decide whether they, or any of them, were so qualified, because their testimony did not support the position that the material was obscene. In *Sanza v. Board of Censors, supra,* the Board adduced a number of witnesses. The Court of Appeals found that only two were qualified as experts in their particular field under the requirements set forth in *Hewitt.*[6]

---

6. Dr. Robert M. Bidaver was found qualified to express an opinion that the film appealed to the prurient interest of the average man. He was "Director of Psychiatric Education for the State of Maryland, Department of Mental Hygiene. Born in, Minneapolis, Minnesota, he lived in the midwest during the early part of his life. He was graduated from Columbia University and studied medicine at the City University of New York, interned at the University of Maryland and the University Hospital, had three years postgraduate training at the Yale Institute and has been on the faculties of the Johns Hopkins Hospital and the University of Maryland. He was Chief of the Psychiatric Section of Medical Service, United States Army."
George Browning, now deceased, was found qualified to testify

In *Williams v. State*, 5 Md. App. 450, we traced the history of appellate review in this jurisdiction of the sufficiency of the evidence in criminal cases. We noted how the question comes before us in jury and non-jury cases and we set out the test to be applied in determining whether or not the evidence was sufficient to sustain the conviction. In *Jacobellis*, however, the Brennan opinion expressly rejected the contention that the determination whether material was obscene "can be treated as a purely factual judgment on which a jury's verdict is all but conclusive, or that in any event the decision can be left essentially to state or lower federal courts, with [the Supreme Court] exercising only a limited review such as that needed to determine whether the ruling below is supported by 'sufficient evidence'. * * * Since it is only 'obscenity' that is excluded from the constitutional protection, the question whether a particular work is obscene necessarily implicates an issue of constitutional law. * * * Our duty admits of no 'substitute for facing up to the tough individual problems of constitutional judgment involved in every obscenity case.'" 378 U. S. at 187-188. The opinion reaffirmed the principle that in obscenity cases the Court had to make an independent constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected. Id. at 190. The Court of Appeals and this Court have recognized the obligation to make an independent constitutional judgment on the facts of such cases. *Sanza v. Board of Censors, supra; Donnenberg v. State, supra.* What is meant when we say baldly, as is said in the opinion of the Court in the instant case, that "the reviewing

---

as to local community standards relating to the description or representation of sexual matters. He "had been connected with the newspaper business practically all his working life. He was a drama and motion picture critic for the Baltimore News and earlier, for the Post for at least fifteen years, and, for a short period, had been a critic on the New York World Telegram. At the time he testified, he was executive secretary of the Motion Picture Owners Association and reviewed motion pictures periodically, although not regularly, for out-of-town publications with nationwide circulation, including 'Box Office,' published in Kansas City and Motion Picture Daily in New York." 245 Md. 319, 328-329.

court has the obligation to make an independent, reflective constitutional judgment on the facts?" The Supreme Court recognizes the obligation whenever a claim of a constitutionally protected right is involved. See *Bachellar v. State of Maryland*, 90 S. Ct. 1312, 1313. It said in *Fiske v. State of Kansas*, 274 U. S. 380 (1927) at 385: "And this Court will review the finding of facts by a State court where a Federal right has been denied as a result of a finding shown by the record to be without evidence to support it; or where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts." In *Pennekamp v. State of Florida*, 328 U. S. 331, 335, the Court said:

> "The Constitution has imposed upon this Court final authority to determine the meaning and application of those words of that instrument which require interpretation to resolve judicial issues. With that responsibilty, we are compelled to examine for ourselves the statements in issue and the circumstances under which they were made to see whether or not they do carry a threat of clear and present danger to the impartiality and good order of the courts or whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect. When the highest court of a state has reached a determination upon such an issue, we give most respectful attention to its reasoning and conclusion but its authority is not final. Were it otherwise the constitutional limits of free expression in the Nation would vary with state lines."

In *Stein v. People of the State of New York*, 346 U. S. 156, the Court said, at 181-182:

> "Of course, this Court cannot allow itself to be completely bound by state court determina-

tion of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding. But that does not mean that we give no weight to the decision below, or approach the record *de novo* or with the latitude of choice open to some state appellate courts, such as the New York Court of Appeals. Mr. Justice Brandeis, for this Court, long ago warned that the Fourteenth Amendment does not, in guaranteeing due process, assure immunity from judicial error. * * * It is only miscarriages of such gravity and magnitude that they cannot be expected to happen in an enlightened system of justice, or be tolerated by it if they do, that cause us to intervene to review, in the name of the Federal Constitution, the weight of conflicting evidence to support a decision by a state court. * * *

A jury and the trial judge — knowing local conditions, close to the scene of events, hearing and observing the witnesses and parties—have the same undeniable advantages over any appellate tribunal in determining the charge of coercion of a confession as in determining the main charge of guilt of the crime. When the issue has been fairly tried and reviewed, and there is no indication that constitutional standards of judgment have been disregarded, we will accord to the state's own decision great and, in the absence of impeachment by conceded facts, decisive respect."

In *Blackburn v. State of Alabama,* 361 U. S. 199, it noted, note 5 at 205: "It is well established, of course, that although this Court will accord respect to the conclusions of the state courts in cases of this nature [involving the voluntariness of a confession], we cannot escape the responsibility of scrutinizing the record ourselves." It held: "After according all the deference to the trial judge's de-

cision which is compatible with our duty to determine constitutional questions, we are unable to escape the conclusion that Blackburn's confession can fairly be characterized only as involuntary." At 205. In *Edwards v. South Carolina,* 372 U. S. 229, the state courts held that the petitioners' conduct constituted breach of the peace under State law. The Supreme Court said: "[W]e may accept their decision as binding upon us to that extent. But it nevertheless remains our duty in a case such as this to make an independent examination of the whole record." It found clear that "in arresting, convicting and punishing the petitioners under the circumstances disclosed by this record, South Carolina infringed the petitioners' constitutionally protected rights of free speech, free assembly, and freedom to petition for redress of their grievances." At 235. In *Haynes v. State of Washington,* 373 U. S. 503 the Court found it well settled that the duty of constitutional adjudication resting upon it requires that the matter of a federal right be the subject of an independent determination by it. It said, at 515-516:

"While, for purposes of review in this Court, the determination of the trial judge or of the jury will ordinarily be taken to resolve evidentiary conflicts and may be entitled to some weight even with respect to the ultimate conclusion on the crucial issue of voluntariness, we cannot avoid our responsibilities by permitting ourselves to be 'completely bound by state court determination of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding.' * * * As state courts are, in instances such as this, charged with the primary responsibility of protecting basic and essential rights, we accord an appropriate and substantial effect to their resolutions of conflicts in evidence as to the occurrence or nonoccurrence of factual events and happenings. This is particularly apposite because the trial judge and jury are clos-

. est to the trial scene and thus afforded the best opportunity to evaluate contradictory testimony. But * * * we cannot be precluded by the verdict of a jury from determining whether the circumstances under which the confession was made were such that its admission in evidence amounts to a denial of due process."

And see *Cox v. State of Louisiana,* 379 U. S. 536, note 8 at 545. I think that the effect of the opinions of the Supreme Court is that when a violation of a constitutional right is asserted and properly before us on appeal the clearly erroneous rule as to the lower court's judgment on the evidence, in a non-jury case, and, the rule that the trial court did not err in permitting the case to go to the jury if there was any evidence or rational inferences therefrom on which the jury could find the accused guilty beyond a reasonable doubt, in a jury case, are not appropriate with regard to the constitutional question. Rather we must resolve the matter by our own independent appraisal of the entire record, including the alleged obscene material, and in so doing we must of necessity weigh the evidence and judge the credibility of the witnesses. And when the question is whether material is obscene, we must make our judgment in the light of testimony of witnesses we are satisfied are qualified as experts on the subject of their testimony.

Making my independent judgment from an examination of the whole record here, I have no difficulty in concluding that the dominant theme of the material taken as a whole does not appeal to a prurient interest in sex. The material was not designed for and primarily disseminated to a clearly defined deviant sexual group but to the public at large. I think it clear that the cartoon and the text accompanying it were not such as to arouse an obsessive interest in improper matters of a sexual nature, or to produce in the average person an itching or a longing or to make him uneasy with a sexual desire or longing. The evidence was simply not sufficient to estab-

lish that the material had even a tendency to excite lustful thoughts. I have serious doubt that the witnesses produced by the State were shown on the record to be qualified as experts as to the elements of obscenity but even if they were, their testimony was not sufficient to show that the dominant theme of the material appealed to a prurient interest in sex. This determination alone would be good reason to reverse the conviction; one of the elements necessary to establish constitutional obscenity has not been proved.

I cannot determine from the record whether or not the material affronts contemporary community standards relating to the description or representation of sexual matters. The State, as the opinion of the Court points out, did not prove what the contemporary community standards are, either national or local. Appellant adduced some evidence that particular material was permitted in the local community and other parts of the country but I do not feel that this evidence was sufficient to prove contemporary community standards. It is not possible to determine that the material here affronted contemporary community standards when the standards themselves are not delineated. Thus the second element was not proved and this alone would be good reason to reverse the conviction.

It may be that any criticism of a public official cannot be said to be *utterly* without social importance. I point out, however, that although the shield of free speech and press protects false as well as true statements critical of public officials, if the false statements are malicious lies the shield is removed. See *The A. S. Abell Company v. Barnes,* 258 Md. 56 (1970). The opinion of the Court "cannot overlook the important fact the *Free Press* was making criticisms which, at least on their face, are protected by the constitutional right of free speech." It is true that the State did not prove or even attempt to prove that the dominant theme of the material—that the judge abused his powers, particularly in cases relating to sexual matters due to his own sexual preoccupation and

therefore was unfit for office—was a malicious lie, but I think that the opinion of the Court places entirely too much emphasis on the redeeming social value of the material. I strongly feel that the material should be considered for what it is—a vile and malicious personal attack on Pugh, J. Even though, from the record, it may not be said to be *utterly* without social importance, to dignify it even by referring to the ideas expressed by such men as Copernicus, Galileo and Darwin is to me utterly absurd.

I observe that this Court could not consider its inquiry foreclosed by the verdict of the jury even if no claim of the violation of a constitutional right were involved. I agree that not the cartoon alone, but the cartoon in conjunction with the entire newspaper and other relevant outside considerations were to be considered in determining whether or not the cartoon was obscene. That being so the evidence went to the jury on instructions that were patently incorrect. The court charged:

> "When we get to the question of considering the cartoon, it has been argued in the case that the cartoon can be considered in and of itself without reference to the printed material on page 9 which surrounds the cartoon. It has also been argued and contended that the cartoon must be considered in relationship to or in context with the printed material on page 9. I advise you that it is up to you, as members of the jury, to decide whether or not the cartoon can be considered separate and apart from the printed text material surrounding it, or whether or not it has to be considered in context with the material. It is a question for you, the jury, to decide. You may consider the cartoon in and of itself, you may consider it in context with the material."

This allowed the jury to determine the obscenity *vel non* of the cartoon without regard to the text, the newspaper

as a whole or "other relevant outside considerations" even if the jury found that the cartoon and the text were related. This clear error in the charge was material to appellant's rights and compels reversal in any event.

As the Supreme Court was composed in the recent past, as has been indicated herein, two members "have consistently adhered to the view that a State is utterly without power to suppress, control or punish the distribution of any writings or pictures upon the ground of their obscenity. A third has held to the opinion that a State's power in this area is narrowly limited to a distinct and clearly identifiable class of material [hard-core pornography]. Others have subscribed to a not dissimilar standard, holding that a State may not constitutionally inhibit the distribution of literary material as obscene unless [the three elements herein discussed are proved]. * * * Another Justice has not viewed the 'social value' element as an independent factor in the judgment of obscenity." *Redrup v. State of New York,* 386 U. S. 767 (per curiam, 1967). Nevertheless, it appears that a majority of the members of the Court then and, from all indications a majority of the members of the Court as it is now constituted, agree that obscenity is not within the area of constitutionally protected speech or press,[7] except that the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime. *Stanley v. State of Georgia,* 394 U. S. 557, 568. Since the dissemination of obscene material may be constitutionally inhibited, I feel that the States desiring to do so should have a fair opportunity within reasonable rules to suppress such material in actions criminal or civil, *in personam* or *in rem.* The present rules of the Supreme Court do not afford this opportunity and the Court does not seem inclined to come to grips with the matter. *Redrup v. New York, Austin v. Kentucky* and *Gent v. Arkansas* were decided in one opinion, 386 U. S. 767, and

---

7. "We hold that obscenity is not within the area of constitutionally protected speech or press." *Roth v. United States, supra,* at 485.

judgments in each were reversed. In *Redrup* the defendant was convicted of selling obscene books; in *Austin* the conviction was for offering obscene literature for sale, in *Gent* the State court declared certain magazines obscene, enjoined their distribution and ordered their surrender and destruction. With no factual description of the content of the material given in the opinion, but noting that in none of the cases was there a claim that the statute in question reflected a specific and limited state concern for juveniles; that in none was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it; and that in none was there evidence of the sort of "pandering" the Court found significant in *Ginzburg v. United States, supra,* the Court held that whichever of the various constitutional views of its members "is brought to bear upon the cases before us, it is clear that the judgments cannot stand." 386 U. S. at 771. Mr. Justice Harlan, joined by Mr. Justice Clark, dissented, remarking that by ruling that the materials could not constitutionally be adjudged obscene by the States, the Court was disposing of them on the issue that was deliberately excluded from review. He thought the dispositions did not reflect well on the processes of the Court. 386 U. S. at 772. Of late a majority of the Court have relied on *Redrup* in summarily setting aside state findings that material was constitutionally obscene. In each of *Cain v. Kentucky,* 90 S. Ct. 1110, 23 March 1970, *Walker v. Ohio,* 7 CrL 4064, 15 June 1970 and *Hoyt v. Minnesota,* 7 CrL 4075, 29 June 1970, the per curiam opinion of the majority simply said, "The judgment is reversed. *Redrup v. New York,* 386 U. S. 676, 87 S. Ct. 1414, 18 L.Ed. 2d 515." In *Cain* Mr. Chief Justice Burger and Mr. Justice Harlan dissented. The Chief Justice's view was that "we should not inflexibly deny to each of the States the power to adopt and enforce its own standards as to obscenity and pornographic materials; States ought to be free to deal with varying conditions and problems in this

area." Mr. Justice Harlan reaffirmed his position set out in his opinions in *Roth* and *Jacobellis*. In *Walker* the same Justices dissented for substantially the same reasons. The Chief Justice pointed out that the trial court, endeavoring to apply the standards articulated by the Supreme Court, held that the materials were obscene, resting its conclusion on a finding that the three elements of *Roth* had been proved. The Ohio appellate court refused to disturb that judgment. "Yet today the Court reverses, citing only *Redrup*." He dissented from such a summary disposition not only because of the reasons expressed in *Cain*, "but also because I find no justification, constitutional or otherwise, for this Court's assuming the role of a supreme and unreviewable board of censorship for the 50 States, subjectively judging each piece of material brought before it without regard to the findings or conclusions of other courts, state or federal. That is not one of the purposes for which this Court was established." In *Hoyt* Mr. Justice Blackmun, with whom the Chief Justice and Mr. Justice Harlan joined, dissented. He pointed out, as did the Chief Justice in *Walker*, that the trial court endeavored to apply the standards articulated by the Supreme Court and reached a conclusion that the materials were obscene and that six of the seven Justices on the State appellate court held the materials obscene as a matter of law, citing *Redrup* and other decisions of the Supreme Court. He could not agree that the State trial court and the State appellate court were "so obviously misguided in their holding that they are to be summarily reversed on the authority of *Redrup*." For him the development of the state law of obscenity in the constitutional sense was still in the unsettled stage. He found himself generally in accord with the views of Mr. Justice Harlan as expressed in *Roth, Jacobellis* and *Fanny Hill* and with those of the Chief Justice in *Cain* and *Walker*.

I would urge the Supreme Court to come to grips with the obscenity issue and make some order out of the chaos it has created. The State law of obscenity in the constitutional sense should be settled. It is high time the Supreme Court did so for the common good.